# NEW YORK CITY TRANSIT AUTHORITY ET AL. *v.* BEAZER ET AL.

No. 77-1427. Argued December 6, 1978—Decided March 21, 1979

Stevens, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, Blackmun, and Rehnquist, JJ., joined. Powell, J., filed an opinion concurring in part and dissenting in part, post, p. 594. Brennan, J., filed a dissenting statement, post, p. 597. White, J., filed a dissenting opinion, in which Marshall, J., joined, post, p. 597.

*Joan Offner* argued the cause for petitioners. With her on the briefs were *Alphonse E. D'Ambrose* and *Helen R. Cassidy.*

*Deborah M. Greenberg* argued the cause for respondents. With her on the brief were *Eric D. Balber, Michael Meltsner,* and *Mark C. Morril.**

Mr. Justice Stevens delivered the opinion of the Court.

The New York City Transit Authority refuses to employ persons who use methadone. The District Court found that this policy violates the Equal Protection Clause of the Fourteenth Amendment. In a subsequent opinion, the court also held that the policy violates Title VII of the Civil Rights Act of 1964. The Court of Appeals affirmed without reaching the statutory question. The departure by those courts from the procedure normally followed in addressing statutory and con-

*\*W. Stell Huie* and *David E. Fox* filed a brief for the American Public Transit Assn. as *amicus curiae* urging reversal.

*Robert B. Stites* filed a brief for the National Association of State Alcohol and Drug Abuse Directors as *amicus curiae* urging affirmance.

*Stuart P. Herman* filed a brief for the Western Law Center for the Handicapped as *amicus curiae.*

stitutional questions in the same case, as well as concern that the merits of these important questions had been decided erroneously, led us to grant certiorari.[1]  438 U. S. 904.  We now reverse.

The Transit Authority (TA) operates the subway system and certain bus lines in New York City.  It employs about 47,000 persons, of whom many—perhaps most—are employed in positions that involve danger to themselves or to the public. For example, some 12,300 are subway motormen, towermen, conductors, or bus operators.  The District Court found that these jobs are attended by unusual hazards and must be performed by "persons of maximum alertness and competence." 399 F. Supp. 1032, 1052 (SDNY 1975).  Certain other jobs, such as operating cranes and handling high-voltage equipment, are also considered "critical" or "safety sensitive," while still others, though classified as "noncritical," have a potentially important impact on the overall operation of the transportation system.[2]

TA enforces a general policy against employing persons

---

[1] This Court's Rule 19 provides:

"Considerations governing review on certiorari

"1. A review on writ of certiorari is not a matter of right, but of sound judicial discretion, and will be granted only where there are special and important reasons therefor.  The following, while neither controlling nor fully measuring the court's discretion, indicate the character of reasons which will be considered:

.          .          .          .          .

"(b) Where a court of appeals . . . has decided a federal question in a way in conflict with applicable decisions of this court; or has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by a lower court, as to call for an exercise of this court's power of supervision."

[2] Thus, about 13,400 employees are involved in the maintenance of subway cars, buses, track, tunnels, and structures.  Another 5,600 work in subway stations, and over 2,000 are engaged in office tasks that include the handling of large sums of money.  TA hires about 3,000 new employees each year.

who use narcotic drugs. The policy is reflected in Rule 11 (b) of TA's Rules and Regulations.

> "Employees must not use, or have in their possession, narcotics, tranquilizers, drugs of the Amphetamine group or barbiturate derivatives or paraphernalia used to administer narcotics or barbiturate derivatives, except with the written permission of the Medical Director—Chief Surgeon of the System."

Methadone is regarded as a narcotic within the meaning of Rule 11 (b). No written permission has ever been given by TA's medical director for the employment of a person using methadone.[3]

---

[3] By its terms, Rule 11 (b) does not apply to persons who formerly used methadone or any other drug, and the District Court did not find that TA had any general policy covering former users. On the contrary, the court found that "[t]he situation is not entirely clear with respect to the policy of the TA regarding persons who have successfully concluded participation in a methadone program." 399 F. Supp., at 1036.

Although it did not settle the question of what policy TA enforces in this respect, the District Court included former users in the plaintiff class. It then afforded them relief from any blanket exclusionary policy that TA *might* enforce, although, again, the supporting factual findings were admittedly "not [based on] a great deal" of evidence. *Id.*, at 1051.

TA contends that the meager evidence received at trial on the "former users" issue was insufficient to support either the class or relief determinations made with respect to those persons. We go further. As far as we are aware there was *no* evidence offered at trial, and certainly none relied upon by the District Court, that TA actually refused employment to any former user entitled to relief under the injunction ordered by that court. (As we point out in n. 12, *infra*, the one named plaintiff, Frasier, who was a former user when the complaint was filed was clearly a *current* user at the time he first applied for a job with TA and may well have been properly perceived as a current user when he next applied, notwithstanding his assertion of successful completion during the intervening three weeks. In any case, he had not completed a full year of methadone maintenance and could therefore be excluded under the District Court's injunction.)

It follows that neither the findings of fact, nor the record evidence, squarely presents any issue with respect to former users that must be

The District Court found that methadone is a synthetic narcotic and a central nervous system depressant. If injected into the bloodstream with a needle, it produces essentially the same effects as heroin.[4] Methadone has been used legitimately in at least three ways—as a pain killer, in "detoxification units" of hospitals as an immediate means of taking addicts off of heroin,[5] and in long-range "methadone maintenance programs" as part of an intended cure for heroin addiction. See 21 CFR § 310.304 (b) (1978). In such programs the methadone is taken orally in regular doses for a prolonged period. As so administered, it does not produce euphoria or any pleasurable effects associated with heroin; on the contrary, it prevents users from experiencing those effects

resolved in order to dispose of this litigation. And, of course, it is those findings and that evidence, rather than statements of the parties on appeal and even offhand and clearly erroneous characterizations of the findings and evidence by the Court of Appeals, see opinion of MR. JUSTICE POWELL, *post*, at 594–595, that determine the issues properly before this Court. A policy excluding all former users would be harder to justify than a policy applicable only to persons currently receiving treatment. A court should not reach out to express an opinion on the constitutionality of such a policy unless necessary to adjudicate a concrete dispute between adverse litigants. We shall therefore confine our consideration to the legality of TA's enforcement of its Rule 11 (b) against *current* users of methadone.

[4] "Heroin is a narcotic which is generally injected into the bloodstream by a needle. It is a central nervous system depressant. The usual effect is to create a 'high'—euphoria, drowsiness—for about thirty minutes, which then tapers off over a period of about three or four hours. At the end of this time the heroin user experiences sickness and discomfort known as 'withdrawal symptoms.' There is intense craving for another shot of heroin, after which the cycle starts over again. A typical addict will inject heroin several times a day." 399 F. Supp., at 1038.

[5] The District Court found that detoxification is accomplished "by switching a heroin addict to methadone and gradually reducing the doses of methadone to zero over a period of about three weeks. The patient thus detoxified is drug free. Moreover, it is hoped that the program of gradually reduced doses of methadone leaves him without the withdrawal symptoms, or the 'physical dependence' on a narcotic." *Ibid.*

when they inject heroin, and also alleviates the severe and prolonged discomfort otherwise associated with an addict's discontinuance of the use of heroin.

About 40,000 persons receive methadone maintenance treatment in New York City, of whom about 26,000 participate in the five major public or semipublic programs,[6] and 14,000 are involved in about 25 private programs.[7] The sole purpose of all these programs is to treat the addiction of persons who have been using heroin for at least two years.

Methadone maintenance treatment in New York is largely governed by regulations promulgated by the New York State Drug Abuse Control Commission. Under the regulations, the newly accepted addict must first be detoxified, normally in a hospital. A controlled daily dosage of methadone is then prescribed. The regulations require that six doses a week be administered at a clinic, while the seventh day's dose may be taken at home. If progress is satisfactory for three months, additional doses may be taken away from the clinic, although

---

[6] "The five major public or semi-public methadone maintenance programs in New York City are:

"(1) The Beth Israel program . . . with 35 clinics treating 7100 patients;

"(2) A program administered by the City of New York with 39 clinics treating 12,400 patients (hereafter referred to as 'the City program');

"(3) A program administered by the Bronx State Hospital and the Albert Einstein College of Medicine, with 7 clinics treating about 2400 patients;

"(4) A program operated by the Addiction Research and Treatment Center (ARTC) with 6 clinics treating about 1200 patients; and

"(5) A program operated by the New York State Drug Abuse Control Commission (DACC), with 8 clinics treating about 1100 patients.

"The total number of patients treated in public or semi-public programs is about 26,000. It appears that these programs are financed almost entirely by federal, state and city funds." *Id.*, at 1040.

[7] "[V]ery little specific information was provided [at trial] regarding the private clinics." *Id.*, at 1046. What evidence there was indicated that those clinics were likely to be less successful and less able to provide accurate information about their clients than the public clinics. *Id.*, at 1046, 1050.

throughout most of the program, which often lasts for several years, there is a minimum requirement of three clinic appearances a week. During these visits, the patient not only receives his doses but is also counseled and tested for illicit use of drugs.[8]

The evidence indicates that methadone is an effective cure for the physical aspects of heroin addiction. But the District Court also found "that many persons attempting to overcome heroin addiction have psychological or life-style problems which reach beyond what can be cured by the physical taking of doses of methadone." 399 F. Supp., at 1039. The crucial indicator of successful methadone maintenance is the patient's abstinence from the illegal or excessive use of drugs and alcohol. The District Court found that the risk of reversion to drug or alcohol abuse declines dramatically after the first few months of treatment. Indeed, "the strong majority" of patients who have been on methadone maintenance for at least a year are free from illicit drug use.[9] But a significant

[8] Although the United States Food and Drug Administration has also issued regulations in this area, 21 CFR §§ 291.501, 291.505 (1978), the New York State regulations are as or more stringent and thus effectively set the relevant standards for the authorized methadone maintenance programs involved in this case. Under those regulations, in-clinic ingestion of methadone must be observed by staff members, 14 NYCRR § 2021.13 (b) (1976), and must occur with a frequency of six days a week during the first three months, no less than three days a week thereafter through the second year of treatment, and two days a week thereafter. § 2021.13 (c)(1). Tests are required to prevent hoarding of take-home doses, excessive use of methadone, and illicit use of other drugs or alcohol, any of which, if found, can result in increased clinic-visit frequency or in separation from the program. §§ 2021.13 (c)(2), 2021.13 (g). The programs are also required to include "a comprehensive range of rehabilitative services on-site under professional supervision," § 2021.13 (e), although participation in many of these services is voluntary and irregular.

[9] "I conclude from all the evidence that the strong majority of methadone maintained persons are successful, at least after the initial period of adjustment, in keeping themselves free of the use of heroin, other illicit drugs, and problem drinking." 399 F. Supp., at 1047.

number are not. On this critical point, the evidence relied upon by the District Court reveals that even among participants with more than 12 months' tenure in methadone maintenance programs, the incidence of drug and alcohol abuse may often approach and even exceed 25%.[10]

This litigation was brought by the four respondents as a class action on behalf of all persons who have been, or would in the future be, subject to discharge or rejection as employees of TA by reason of participation in a methadone maintenance program. Two of the respondents are former employees of TA who were dismissed while they were receiving methadone treatment.[11] The other two were refused employment by TA, one both shortly before and shortly after the successful conclusion of his methadone treatment,[12] and the other while he

---

[10] Thus, for example:

"Dr. Trigg of Beth Israel testified that about 5,000 out of the 6,500–7,000 patients in his clinics have been on methadone maintenance for a year or more. He further testified that 75% of this 5,000 are free from illicit drug use." *Id.*, at 1046.

Similarly, although the figures may be somewhat higher for the city and Bronx State Hospital programs, only 70% of the ARTC patients with a year's tenure or more were found to be free from illicit drug or alcohol use. It is reasonable to infer from this evidence that anywhere from 20% to 30% of those who have been on maintenance for over a year have drug or alcohol problems.

[11] Respondent Beazer was dismissed in November 1971 when his heroin addiction became known to TA and shortly after he had enrolled in a methadone maintenance program; he successfully terminated his treatment in November 1973. Respondent Reyes began his methadone treatment in 1971 and was dismissed by TA in 1972. At the time of trial, in 1975, he was still participating in a methadone program.

[12] Respondent Frasier was on methadone maintenance for only five months, from October 1972 until March 1973. TA refused to employ him as a bus operator in March 1973 and as a bus cleaner in April 1973. Frasier did not participate in a methadone program for even half a year. Moreover, he tested positively for methadone use at the time of his March application and only a few weeks before his April application was rejected under Rule 11 (b). See 399 F. Supp., at 1034; App. 32A. Under these

was taking methadone.[13]  Their complaint alleged that TA's blanket exclusion of all former heroin addicts receiving methadone treatment was illegal under the Civil Rights Act of 1866, Rev. Stat. § 1977, 42 U. S. C. § 1981, Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e *et seq.,* and the Equal Protection Clause of the Fourteenth Amendment.

The trial record contains extensive evidence concerning the success of methadone maintenance programs, the employability of persons taking methadone, and the ability of prospective employers to detect drug abuse or other undesirable characteristics of methadone users.  In general, the District Court concluded that there are substantial numbers of methadone users who are just as employable as other members of the general population and that normal personnel-screening procedures—at least if augmented by some method of obtaining information from the staffs of methadone programs—would enable TA to identify the unqualified applicants on an individual basis.  399 F. Supp., at 1048–1051.  On the other hand, the District Court recognized that at least one-third of the persons receiving methadone treatment—and probably a good many more—would unquestionably be classified as unemployable.[14]

circumstances, the District Court's characterization of Frasier as a "former" user at the time he applied, and its inclusion of Frasier in the group of "tenured" methadone users for whom it felt relief was appropriate under the Equal Protection Clause, see n. 32, *infra,* are without apparent justification.

[13] Respondent Diaz entered a methadone maintenance program in December 1968 and was still receiving treatment at the time of trial.  He was refused employment as a maintenance helper in 1970.

[14] The District Court summarized the testimony concerning one of the largest and most successful public programs:

"The witnesses from the Beth Israel program testified that about one-third of the patients in that program, after a short period of adjustment, need very little more than the doses of methadone.  The persons in this category are situated fairly satisfactorily with respect to matters such

After extensively reviewing the evidence, the District Court briefly stated its conclusion that TA's methadone policy is unconstitutional. The conclusion rested on the legal proposition that a public entity "cannot bar persons from employment on the basis of criteria which have no rational relation to the demands of the jobs to be performed." *Id.*, at 1057. Because it is clear that substantial numbers of methadone users are capable of performing many of the jobs at TA, the court held that the Constitution will not tolerate a blanket exclusion of all users from all jobs.

The District Court enjoined TA from denying employment to any person solely because of participation in a methadone maintenance program. Recognizing, however, the special responsibility for public safety borne by certain TA employees and the correlation between longevity in a methadone maintenance program and performance capability, the injunction authorized TA to exclude methadone users from specific categories of safety-sensitive positions and also to condition eligibility on satisfactory performance in a methadone program for at least a year. In other words, the court held that TA could lawfully adopt general rules excluding all methadone users from some jobs and a large number of methadone users from all jobs.

Almost a year later the District Court filed a supplemental opinion allowing respondents to recover attorney's fees under 42 U. S. C. § 2000e–5 (k). This determination was premised on the court's additional holding that TA's drug policy violated Title VII. Having already concluded that the blanket

as family ties, education and jobs. Another one-third of the patients at Beth Israel need a moderate amount of rehabilitation service, including vocational assistance, for a period of several months or about a year. A person in this category may, for instance, have finished high school, but may have a long heroin history and no employment record. A final one-third of the patients at Beth Israel need intensive supportive services, are performing in the program marginally, and either will be discharged or will be on the brink of discharge." 399 F. Supp., at 1048.

exclusion was not rationally related to any business needs of TA, the court reasoned that the statute is violated if the exclusionary policy has a discriminatory effect against blacks and Hispanics. That effect was proved, in the District Court's view, by two statistics: (1) of the employees referred to TA's medical consultant for suspected violation of its drug policy, 81% are black or Hispanic; (2) between 62% and 65% of all methadone-maintained persons in New York City are black or Hispanic. 414 F. Supp. 277, 278–279 (SDNY 1976). The court, however, did not find that TA's policy was motivated by any bias against blacks or Hispanics; indeed, it expressly found that the policy was not adopted with a discriminatory purpose. *Id.*, at 279.

The Court of Appeals affirmed the District Court's constitutional holding. 558 F. 2d 97. While it declined to reach the statutory issue, it also affirmed the award of attorney's fees under the aegis of the recently enacted Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988, which provides adequate support for an award of legal fees to a party prevailing on a constitutional claim.[15]

After we granted certiorari, Congress amended the Rehabilitation Act of 1973, 87 Stat. 357, 29 U. S. C. § 701 *et seq.*, to prohibit discrimination against a class of "handicapped individuals" that arguably includes certain former drug abusers and certain current users of methadone. Pub. L. 95–602, 92 Stat. 2984. Respondents argue that the amendment now

---

[15] The Court of Appeals reversed the District Court on one issue relating to relief. The lower court had denied reinstatement and backpay relief to two of the four named plaintiffs because they admitted having violated TA's unquestionably valid rule against taking heroin while being in TA's employ. App. to Pet. for Cert. 77a–78a. The Court of Appeals reversed. It determined that the two plaintiffs' former heroin use and violation of TA's rules on that account were irrelevant because TA explicitly premised their firing exclusively on their use of methadone. 558 F. 2d, at 101.

mandates at least the prospective relief granted by the District Court and the Court of Appeals and that we should therefore dismiss the writ as improvidently granted. We are satisfied, however, that we should decide the constitutional question presented by the petition. Before doing so, we shall discuss (1) the effect of the Rehabilitation Act on this case; and (2) the error in the District Court's analysis of Title VII.

I

Respondents contend that the recent amendment to § 7 (6) of the Rehabilitation Act proscribes TA's enforcement of a general rule denying employment to methadone users.[16] Even if respondents correctly interpret the amendment, and even if they have a right to enforce that interpretation,[17] the case

---

[16] Section 504 of the Rehabilitation Act, 87 Stat. 394, as set forth in 29 U. S. C. § 794, provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 706 (6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

It is stipulated that the TA receives federal financial assistance.

In relevant part, § 7 (6) of the Act, 29 U. S. C. § 706 (6), as amended and redesignated, 92 Stat. 2984, 29 U. S. C. § 706 (7)(B) (1976 ed., Supp. III), provides:

"[T]he term 'handicapped individual' . . . means any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment. For purposes of sections 503 and 504 as such sections relate to employment, such term does not include any individual who is an alcoholic or drug abuser whose current use of alcohol or drugs prevents such individual from performing the duties of the job in question or whose employment, by reason of such current alcohol or drug abuse, would constitute a direct threat to property or the safety of others."

[17] The question whether a cause of action on behalf of handicapped persons may be implied under § 504 of the Rehabilitation Act will be addressed by this Court in *Southeastern Community College* v. *Davis*, No. 78–711, cert. granted, 439 U. S. 1065.

is not moot since their claims arose even before the Act itself was passed,[18] and they have been awarded monetary relief.[19] Moreover, the language of the statute, even after its amendment, is not free of ambiguity,[20] and no administrative or judicial opinions specifically considering the impact of the statute on methadone users have been called to our attention. Of greater importance, it is perfectly clear that however we might construe the Rehabilitation Act, the concerns that prompted our grant of certiorari would still merit our attention.[21] We therefore decline to give the statute its first judicial construction at this stage of the litigation.

---

[18] The latest act of alleged discrimination cited in respondents' complaint occurred in April 1973, while the Act was passed on September 26, 1973, Pub. L. 93–112, Title V, and the amendment to § 7 (6) went into effect on November 6, 1978.

[19] See n. 17, *supra.*

[20] In order for the District Court's findings to bring the respondent class conclusively within the Act, we would have to find that denying employment to a methadone user because of that use amounts to excluding an "otherwise qualified handicapped individual . . . solely by reason of his handicap." Among other issues, this would require us to determine (1) whether heroin addicts or current methadone users qualify as "handicapped individual[s]"—*i. e.*, whether that addiction or use is (or is perceived as) a "physical . . . impairment which substantially limits one or more . . . major life activities"; (2) whether methadone use prevents the individual "from performing the duties of the job" or "would constitute a direct threat to property or the safety of others"; and (3) whether the members of the respondent class are "otherwise qualified"—the meaning of which phrase is at issue in *Southeastern Community College* v. *Davis, supra.*

[21] See n. 1, *supra,* and accompanying text. Respondents may exaggerate the degree to which the recent amendment altered the law as it existed when we granted certiorari. Even before the Court of Appeals heard argument in this case, in fact, the Attorney General of the United States had issued an interpretation of the Act as it then existed which concluded that the Act "does in general prohibit discrimination against alcoholics and drug addicts in federally-assisted programs . . . ." Opinion of the Honorable Griffin B. Bell, Attorney General of the United States, to the Honorable Joseph A. Califano, Secretary, Department of Health,

## II

Although respondents have consistently relied on both statutory and constitutional claims, the lower courts focused primarily on the latter. Thus, when the District Court decided the Title VII issue, it did so only as an afterthought in order to support an award of attorney's fees; the Court of Appeals did not even reach the Title VII issue. We do not condone this departure from settled federal practice. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105. Before deciding the constitutional question, it was incumbent on those courts to consider whether the statutory grounds might be dispositive.[22]  What-

Education, and Welfare, Apr. 12, 1977. Respondents brought this interpretation to our attention before we granted certiorari. App. to Brief in Opposition A5–A6.

[22] "From *Hayburn's Case,* 2 Dall. 409, to *Alma Motor Co.* v. *Timken-Detroit Axle Co.*[, 329 U. S. 129,] and the Hatch Act case[, *United Public Workers* v. *Mitchell,* 330 U. S. 75,] decided this term, this Court has followed a policy of strict necessity in disposing of constitutional issues. The earliest exemplifications, too well known for repeating the history here, arose in the Court's refusal to render advisory opinions and in applications of the related jurisdictional policy drawn from the case and controversy limitation. U. S. Const., Art. III. . . .

"The policy, however, has not been limited to jurisdictional determinations. For, in addition, 'the Court [has] developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision.' Thus, as those rules were listed in support of the statement quoted, constitutional issues affecting legislation will not be determined in friendly, nonadversary proceedings; in advance of the necessity of deciding them; in broader terms than are required by the precise facts to which the ruling is to be applied; if the record presents some other ground upon which the case may be disposed of; at the instance of one who fails to show that he is injured by the statute's operation, or who has availed himself of its benefits; or if a con-

ever their reasons for not doing so,[23] we shall first dispose of the Title VII issue.[24]

The District Court's findings do not support its conclusion

struction of the statute is fairly possible by which the question may be avoided." *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–569 (footnotes omitted), quoting *Ashwander* v. *TVA,* 297 U. S. 288, 346 (Brandeis, J., concurring).

[23] Respondents suggest that the lower courts properly reached the constitutional issue first because only under the Equal Protection Clause could all of the class members, including white methadone users (who presumably do not have standing in this case under Title VII or § 1981) obtain all of the relief including backpay, sought in their complaint. In addition, they point to TA's argument that Title VII and § 1981 are unconstitutional insofar as they authorize relief against a state subdivision without any direct allegation or proof of intentional discrimination. Cf. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445; *National League of Cities* v. *Usery,* 426 U. S. 833; *Washington* v. *Davis,* 426 U. S. 229; *Fry* v. *United States,* 421 U. S. 542; *Katzenbach* v. *Morgan,* 384 U. S. 641. Under this latter point, it is argued that the District Court quite properly decided to address the constitutionality of a municipal agency's hiring practices before addressing the constitutionality of two Acts of Congress.

Whatever the theoretical validity of respondents' explanations for the actions of the District Court and the Court of Appeals, the fact remains that we are forced to speculate about what motivated them because they never explained their haste to address a naked constitutional issue despite the presence in the case of alternative statutory theories. It also bears noting that in its second opinion the District Court *did* decide that TA's policy violated a federal statute, and its decision, without addressing any constitutional issue, provided a statutory basis for virtually all of the relief that it ultimately awarded. Had it confronted the issue, therefore, it presumably would have concluded that it could have decided the case without addressing the constitutional issue on which it initially decided the case.

[24] The failure of the Court of Appeals to address the statutory issue decided by the District Court does not, of course, prevent this Court from reaching the issue. Cf. *University of California Regents* v. *Bakke,* 438 U. S. 265. We conclude that it is appropriate to reach the issue in this case, rather than remand it to the Court of Appeals, because it was fully aired before the District Court, it involves the application of settled legal principles to uncontroversial facts, and it has been carefully briefed in

that TA's regulation prohibiting the use of narcotics, or its interpretation of that regulation to encompass users of methadone, violated Title VII of the Civil Rights Act.

A prima facie violation of the Act may be established by statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employment opportunities. Even assuming that respondents have crossed this threshold, when the entire record is examined it is clear that the two statistics on which they and the District Court relied do not prove a violation of Title VII.[25]

First, the District Court noted that 81% of the employees referred to TA's medical director for suspected violation of its narcotics rule were either black or Hispanic. But respondents

---

this Court without any of the parties' even suggesting the possibility of a remand.

Moreover, our treatment of the Title VII claim also disposes of the § 1981 claim without need of a remand. Although the exact applicability of that provision has not been decided by this Court, it seems clear that it affords no greater substantive protection than Title VII.

[25] "Statistics are . . . competent in proving employment discrimination. We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all the surrounding facts and circumstances." *Teamsters* v. *United States,* 431 U. S. 324, 339–340 (footnote omitted).

From the time they filed their complaint until their submissions to this Court, respondents have relied on statistics to demonstrate the discriminatory *effect* of TA's methadone policy. They have never attempted to present a discriminatory *purpose* case and would be hard pressed to do so in the face of the District Court's explicit finding that no animus motivated TA in establishing its policy, 414 F. Supp. 277, 279 (SDNY 1976), and in the face of TA's demonstration in forms filed with the Equal Employment Opportunity Commission that the percentage of blacks and Hispanics in its work force is well over twice that of the percentage in the work force in the New York metropolitan area.

Because of our conclusion on the merits of respondents' Title VII claim, we need not address the constitutional challenge made by TA to Title VII insofar as it authorizes relief against a municipal agency under the circumstances of this case. See n. 23, *supra.*

have only challenged the rule to the extent that it is construed to apply to methadone users, and that statistic tells us nothing about the racial composition of the employees suspected of using methadone.[26] Nor does the record give us any information about the number of black, Hispanic, or white persons who were dismissed for using methadone.

Second, the District Court noted that about 63% of the persons in New York City receiving methadone maintenance in *public* programs—i. e., 63% of the 65% of all New York City methadone users who are in such programs [27]—are black or Hispanic. We do not know, however, how many of these persons ever worked or sought to work for TA. This statistic therefore reveals little if anything about the racial composition of the class of TA job applicants and employees receiving methadone treatment. More particularly, it tells us nothing about the class of otherwise-qualified applicants and employees who have participated in methadone maintenance

---

[26] Indeed, it is probable that none of the employees comprising this 81% were methadone users. The parties stipulated that:

"TA employees showing physical manifestations of drug abuse *other than* the definite presence of morphine or *methadone* or other illicit drug in the urine, are referred for consultation to [the medical director] . . . ." App. 86A (emphasis added).

In view of this stipulation and the District Court's finding that few if any physical manifestations of drug abuse characterize methadone-maintained persons, 399 F. Supp., at 1042–1045, it seems likely that such persons would not be included in the statistical pool referred to by the District Court. It should also be noted that when the dissent refers to the rejection of almost 5% of all applicants "due to the rule," *post*, at 600, the reference is to all narcotics users rather than to methadone users. The record does not tell us how many methadone users were rejected.

[27] The statistic relied upon by the District Court was derived from a study of methadone patients prepared by a researcher at Rockefeller University based upon data supplied by the public methadone clinics in New York City. In that the District Court admittedly received virtually no evidence about the private clinics, their funding, and their participants, see n. 7, *supra*, there is no basis for assuming that the Rockefeller University statistic is applicable to participants in the private programs.

programs for over a year—the only class improperly excluded by TA's policy under the District Court's analysis. The record demonstrates, in fact, that the figure is virtually irrelevant because a substantial portion of the persons included in it are either unqualified for other reasons—such as the illicit use of drugs and alcohol [28]—or have received successful assistance in finding jobs with employers other than TA.[29] Finally, we have absolutely no data on the 14,000 methadone users in the *private* programs, leaving open the possibility that the percentage of blacks and Hispanics in the class of methadone users is not significantly greater than the percentage of those minorities in the general population of New York City.[30]

---

[28] To demonstrate employability, the District Court referred to a study indicating that 34% to 59% of the methadone users who have been in a maintenance program for a substantial period of time are employed. The evidence was inconclusive with respect to all methadone users. 399 F. Supp., at 1047. However, the director of the second largest program in New York City testified that only 33% of the entire methadone-patient population in that program were employable. Tr. 345 (Jan. 10, 1975). On the statistics relating to illicit use of drugs and alcohol, see *supra*, at 575–576.

[29] Although "a statistical showing of disproportionate impact [need not] always be based on an analysis of the characteristics of actual applicants," *Dothard* v. *Rawlinson,* 433 U. S. 321, 330, "evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants" undermines the significance of such figures. *Teamsters* v. *United States, supra,* at 340 n. 20.

[30] If all of the participants in private clinics are white, for example, then only about 40% of all methadone users would be black or Hispanic—compared to the 36.3% of the total population of New York City that was black or Hispanic as of the 1970 census. Assuming instead that the percentage of those minorities in the private programs duplicates their percentage in the population of New York City, the figures would still only show that 50% of all methadone users are black or Hispanic compared to 36.3% of the population in the metropolitan area. (The 20% figure relied upon by the dissent refers to blacks and Hispanics in the work force, rather than in the total population of the New York City metropolitan area. The reason the total-population figure is the appropriate one is because the 63% figure

At best, respondents' statistical showing is weak; even if it is capable of establishing a prima facie case of discrimination, it is assuredly rebutted by TA's demonstration that its narcotics rule (and the rule's application to methadone users) is "job related." [31] The District Court's express finding that the rule was not motivated by racial animus forecloses any claim in rebuttal that it was merely a pretext for intentional discrimination. 414 F. Supp., at 279. We conclude that respondents failed to prove a violation of Title VII. We therefore must reach the constitutional issue.

## III

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." The Clause announces a fundamental principle: the State must govern impartially. General rules that apply evenhandedly to all persons within the jurisdiction unquestionably comply with this principle. Only when a governmental unit adopts a rule that has a special impact on less than all the persons subject

---

relied upon by respondents refers to methadone users in the population generally and not just those in the work force.)

[31] Respondents recognize, and the findings of the District Court establish, that TA's legitimate employment goals of safety and efficiency require the exclusion of all users of illegal narcotics, barbiturates, and amphetamines, and of a majority of all methadone users. See n. 4, *supra; supra,* at 575–576, and nn. 9–10; 577, and n. 14; n. 28, *supra.* The District Court also held that those goals require the exclusion of all methadone users from the 25% of its positions that are "safety sensitive." See *supra,* at 578. Finally, the District Court noted that those goals are significantly served by—even if they do not require—TA's rule as it applies to all methadone users including those who are seeking employment in non-safety-sensitive positions. See nn. 33, 37, *infra.* The record thus demonstrates that TA's rule bears a "manifest relationship to the employment in question." *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 432. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 425. Whether or not respondents' weak showing was sufficient to establish a prima facie case, it clearly failed to carry respondents' ultimate burden of proving a violation of Title VII.

to its jurisdiction does the question whether this principle is violated arise.

In this case, TA's Rule 11 (b) places a meaningful restriction on all of its employees and job applicants; in that sense the rule is one of general applicability and satisfies the equal protection principle without further inquiry. The District Court, however, interpreted the rule as applicable to the limited class of persons who regularly use narcotic drugs, including methadone. As so interpreted, we are necessarily confronted with the question whether the rule reflects an impermissible bias against a special class.

Respondents have never questioned the validity of a special rule for all users of narcotics. Rather, they originally contended that persons receiving methadone should not be covered by that rule; in other words, they should not be included within a class that is otherwise unobjectionable. Their constitutional claim was that methadone users are entitled to be treated like most other employees and applicants rather than like other users of narcotics. But the District Court's findings unequivocally establish that there are relevant differences between persons using methadone regularly and persons who use no narcotics of any kind.[32]

---

[32] The District Court found that methadone is a narcotic. See 399 F. Supp., at 1038. See also *id.,* at 1044 ("The evidence is that, during the time patients are being brought up to their constant dosage of methadone (a period of about six weeks), there may be complaints of drowsiness, insomnia, excess sweating, constipation, and perhaps some other symptoms"). Moreover, every member of the class of methadone users was formerly addicted to the use of heroin. None is completely cured; otherwise, there would be no continuing need for treatment. All require some measure of special supervision, and all must structure their weekly routines around mandatory appearances at methadone clinics. The clinics make periodic checks as long as the treatment continues in order to detect evidence of drug abuse. Employers must review, and sometimes verify, these checks; since the record indicates that the information supplied by treatment centers is not uniformly reliable, see n. 7, *supra,* the employer

Respondents no longer question the need, or at least the justification, for special rules for methadone users. Indeed, they vigorously defend the District Court's opinion which expressly held that it would be permissible for TA to have a special rule denying methadone users any employment unless they had been undergoing treatment for at least a year, and another special rule denying even the most senior and reliable methadone users any of the more dangerous jobs in the system.

The constitutional defect in TA's employment policies, according to the District Court, is not that TA has special rules for methadone users, but rather that *some* members of the class should have been exempted from *some* requirements of the special rules. Left intact by its holding are rules requiring special supervision of methadone users to detect evidence of drug abuse, and excluding them from high-risk employment. Accepting those rules, the District Court nonetheless concluded that employment in nonsensitive jobs could not be denied to methadone users who had progressed satisfactorily with their treatment for one year, and who, when examined individually, satisfied TA's employment criteria. In short, having recognized that disparate treatment of methadone users simply because they are methadone users is permissible—and having excused TA from an across-the-board requirement of individual consideration of such persons—the District Court construed the Equal Protection Clause as requiring TA to adopt additional and more precise special rules for that special class.

---

has a special and continuing responsibility to review the condition of these persons.

In addition, a substantial percentage of persons taking methadone will not successfully complete the treatment program. The findings do not indicate with any precision the number who drop out, or the number who can fairly be classified as unemployable, but the evidence indicates that it may well be a majority of those taking methadone at any given time. See nn. 14 and 28, *supra*.

590

But any special rule short of total exclusion that TA might adopt is likely to be less precise—and will assuredly be more costly[33]—than the one that it currently enforces. If eligibility is marked at any intermediate point—whether after one year of treatment or later—the classification will inevitably discriminate between employees or applicants equally or

[33] The District Court identified several significant screening procedures that TA would have to adopt specially for methadone users if it abandoned its rule. For example, the court noted that current methadone users (but no other applicants) would have to

"demonstrate that they have been on a reliable methadone program for a year or more; that they have faithfully abided by the rules of the program; [and] that, according to systematic tests and observations, they have been free of any illicit drug or alcohol abuse for the entire period of treatment, excluding a possible adjustment period . . . ." 399 F. Supp., at 1049.

The District Court also recognized that verifying the above demonstrations by the methadone user would require special efforts to obtain reliable information from, *and about*, each of the many different methadone maintenance clinics—a task that it recognized could be problematic in some cases. *Id.*, at 1050; see n. 7, *supra*. Furthermore, once it hired a methadone user, TA would have a continuing duty to monitor his progress in the maintenance program and would have to take special precautions against his promotion to any of the safety-sensitive positions from which the District Court held he may be excluded.

The dissent is therefore repeatedly mistaken in attributing to the District Court a finding that TA's "normal screening process without additional effort" would suffice in the absence of the "no drugs" rule. *Post,* at 608. See *post,* at 608 n. 14. Aggravating this erroneous factual assumption is a mistaken legal proposition advanced by the dissent—that TA can be faulted for failing to prove the unemployability of "successfully maintained methadone users. *Post,* at 605. Aside from the misallocation of the burden of proof that underlies this argument, it is important to note, see *post,* at 606, that TA *did* prove that 20% to 30% of the class afforded relief by the District Court are *not* "successfully maintained," and hence are assuredly not employable. Even assuming therefore that the percentage of employable persons in the remaining 70% is the same as that in the class of TA applicants who do not use methadone, it is respondents who must be faulted for failing to prove that the offending 30% could be excluded as cheaply and effectively in the absence of the rule.

almost equally apt to achieve full recovery.[34] Even the District Court's opinion did not rigidly specify one year as a constitutionally mandated measure of the period of treatment that guarantees full recovery from drug addiction.[35] The uncertainties associated with the rehabilitation of heroin addicts precluded it from identifying any bright line marking the point at which the risk of regression ends.[36] By contrast, the "no drugs" policy now enforced by TA is supported by the legitimate inference that as long as a treatment program (or other drug use) continues, a degree of uncertainty persists.[37] Accordingly, an employment policy that postpones

---

[34] It may well be, in fact, that many methadone users who have been in programs for something less than a year are actually more qualified for employment than many others who have been in a program for longer than a year.

[35] "The TA is not prevented from making reasonable rules and regulations about methadone maintained persons—such as requiring satisfactory performance in a program for a period of time such as a year . . . ." 399 F. Supp., at 1058.

[36] These uncertainties are evident not only in the District Court's findings but also in legislative consideration of the problem. See *Marshall* v. *United States*, 414 U. S. 417, 425–427.

[37] The completion of the program also marks the point at which the employee or applicant considers himself cured of drug dependence. Moreover, it is the point at which the employee/applicant no longer must make regular visits to a methadone clinic, no longer has access to free methadone that might be hoarded and taken in excessive and physically disruptive doses, and at which a simple urine test—as opposed to a urine test followed up by efforts to verify the bona fides of the subject's participation in a methadone program, and of the program itself—suffices to prove compliance with TA's rules.

Respondents argue that the validity of these considerations is belied by TA's treatment of alcoholics. Although TA refuses to hire new employees with drinking problems, it continues in its employ a large number of persons who have either been found drinking on the job or have been deemed unfit for duty because of prior drinking. These situations give rise to discipline but are handled on an individual basis. But the fact that TA has the resources to expend on one class of problem employees

eligibility until the treatment program has been completed, rather than accepting an intermediate point on an uncertain line, is rational. It is neither unprincipled nor invidious in the sense that it implies disrespect for the excluded subclass.

At its simplest, the District Court's conclusion was that TA's rule is broader than necessary to exclude those methadone users who are not actually qualified to work for TA. We may assume not only that this conclusion is correct but also that it is probably unwise for a large employer like TA to rely on a general rule instead of individualized consideration of every job applicant. But these assumptions concern matters of personnel policy that do not implicate the principle safeguarded by the Equal Protection Clause.[38] As the District Court recognized, the special classification created by TA's rule serves the general objectives of safety and efficiency.[39] Moreover, the exclusionary line challenged by respondents "is not one which is directed 'against' any individual or category of persons, but rather it represents a policy choice . . . made by that branch of Government vested with the power to make such choices." *Marshall* v. *United States,* 414 U. S. 417, 428.

---

does not by itself establish a constitutional duty on its part to come up with resources to spend on all classes of problem employees.

[38] The District Court also concluded that TA's rule violates the Due Process Clause because it creates an "irrebuttable presumption" of unemployability on the part of methadone users. 399 F. Supp., at 1057. Respondents do not rely on the due process argument in this Court, and we find no merit in it.

[39] "[L]egislative classifications are valid unless they bear no rational relationship to the State's objectives. *Massachusetts Bd. of Retirement* v. *Murgia,* [427 U. S. 307, 314]. State legislation 'does not violate the Equal Protection Clause merely because the classifications [it makes] are imperfect.' *Dandridge* v. *Williams,* 397 U. S. 471, 485." *Washington* v. *Yakima Indian Nation,* 439 U. S. 463, 501–502. See also *Vance* v. *Bradley, ante,* at 108, quoting *Phillips Chemical Co.* v. *Dumas School District,* 361 U. S. 376, 385 ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this 'perfection is by no means required' ").

Because it does not circumscribe a class of persons character-
ized by some unpopular trait or affiliation, it does not create
or reflect any special likelihood of bias on the part of the
ruling majority.[40] Under these circumstances, it is of no
constitutional significance that the degree of rationality is not
as great with respect to certain ill-defined subparts of the
classification as it is with respect to the classification as a
whole. *Mathews* v. *Diaz,* 426 U. S. 67, 83–84.[41]

---

[40] Since *Barbier* v. *Connolly,* 113 U. S. 27, the Court's equal protection
cases have recognized a distinction between "invidious discrimination,"
*id.,* at 30—*i. e.,* classifications drawn "with an evil eye and an unequal
hand" or motivated by "a feeling of antipathy" against, a specific group
of residents, *Yick Wo* v. *Hopkins,* 118 U. S. 356, 373–374; *Soon Hing* v.
*Crowley,* 113 U. S. 703, 710; see also *Quong Wing* v. *Kirkendall,* 223 U. S.
59; *Holden* v. *Hardy,* 169 U. S. 366, 398—and those special rules that "are
often necessary for general benefits [such as] supplying water, preventing
fires, lighting districts, cleaning streets, opening parks, and many other ob-
jects." *Barbier, supra,* at 31. See also *Washington* v. *Davis,* 426 U S. 229,
239–241. Quite plainly, TA's Rule 11 (b) was motivated by TA's interest
in operating a safe and efficient transportation system rather than by any
special animus against a specific group of persons. Cf. 414 F. Supp., at
279. Respondents recognize this valid general motivation, as did the Dis-
trict Court, and for that reason neither challenges TA's rule as it applies
to *all* narcotic users, or even to *all* methadone users. Because respondents
merely challenge the rule insofar as it applies to *some* methadone users,
that challenge does not even raise the question whether the rule falls on
the "invidious" side of the *Barbier* distinction. Accordingly, there is noth-
ing to give rise to a presumption of illegality and to warrant our especially
"attentive judgment." Cf. *Truax* v. *Corrigan,* 257 U. S. 312, 327.

[41] "When a legal distinction is determined, as no one doubts that it may
be, between night and day, childhood and maturity, or any other ex-
tremes, a point has to be fixed or a line has to be drawn, or gradually
picked out by successive decisions, to mark where the change takes place.
Looked at by itself without regard to the necessity behind it the line or
point seems arbitrary. It might as well or nearly as well be a little more
to one side or the other. But when it is seen that a line or point there
must be, and that there is no mathematical or logical way of fixing it pre-
cisely, the decision of the legislature must be accepted unless we can say
that it is very wide of any reasonable mark." *Louisville Gas Co.* v. *Cole-
man,* 277 U. S. 32, 41 (Holmes, J., dissenting).

No matter how unwise it may be for TA to refuse employment to individual car cleaners, track repairmen, or bus-drivers simply because they are receiving methadone treatment, the Constitution does not authorize a federal court to interfere in that policy decision.   The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE POWELL, concurring in part and dissenting in part.

The opinion of the Court addresses, and sustains, the policy of the Transit Authority under its Rule 11 (b) only insofar as it applies to employees and applicants for employment who *"are receiving methadone treatment"* (emphasis supplied).   *Ante,* at 572–573, n. 3, and *ante,* this page.   I concur in the opinion of the Court holding that there is no violation of the Equal Protection Clause or Title VII when the Authority's policy is applied to employees or applicants who are currently on methadone.

But in my view the question presented by the record and opinions of the courts below is not limited to the effect of the rule on present methadone users.   Indeed, I had thought it conceded by all concerned that the Transit Authority's policy of exclusion extended beyond the literal language of Rule 11 (b) to persons currently free of methadone use but who had been on the drug within the previous five years.   The District Court was unsure whether all past users were excluded but indicated that the policy of exclusion covered at least persons who had been free of methadone use for less than five years.   399 F. Supp. 1032, 1036 (SDNY 1975).[1]   The Court of

---

[1] The District Court also noted that the Authority "contends that it cannot afford to take what it considers the risks of employing *present or past* methadone maintained persons, except possibly those who have been successfully withdrawn from methadone for several years." 399 F. Supp., at 1052 (emphasis supplied).

Appeals for the Second Circuit was unequivocal. It understood that the rule constituted a "blanket exclusion from employment of all persons participating in or having successfully concluded methadone maintenance programs." 558 F. 2d 97, 99 (1977).

Petitioners' brief in this Court states, in effect, that the Authority will consider only applicants for employment who have been free of a drug problem for "at least five years":

> "[T]he Authority will give individual consideration to people with a past history of drug addiction including those who have completed either a drug free or a methadone maintenance program, and who have been completely drug free and have had a stable history for at least five years." Brief for Petitioners 5.

There was a similar recognition of the Authority's policy in the petition for a writ of certiorari.[2]

Despite this unanimity among the parties and courts below as to the question presented, the Court today simply chooses to limit its decision to the policy with respect to employees and applicants currently receiving methadone treatment. The explanation given is that "neither the findings of fact, nor the record evidence, squarely presents any issue with respect to former users that must be resolved in order to dispose of this litigation." *Ante,* at 572–573, n. 3. But the only support the Court cites for this statement is a lack of proof as to the policy's actual application. In light of the express admission

---

[2] In petitioners' statement of the case the affected class was said to include former addicts "who are participants in or *have completed* a methadone maintenance program." Pet. for Cert. 4 (emphasis supplied).

The brief for respondents similarly described the Transit Authority's policy:

"The Transit Authority's blanket denial of employment to fully rehabilitated heroin addicts who are being or ever have been treated in methadone maintenance programs violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment." Brief for Respondents 59.

of the Transit Authority to the District Court that the policy extended to at least some former users,[3] evidence of the past application of the policy was irrelevant to the fashioning of prospective relief.[4]

I conclude that the Court has decided only a portion of the case presented, and has failed to address what it recognizes as the more difficult issue. *Ante,* at 572–573, n. 3, 591–592, and n. 37. We owe it to the parties to resolve all issues properly presented, rather than to afford no guidance whatever as to whether former drug and methadone users may be excluded from employment by the Authority. I agree with the courts below that there is no rational basis for an absolute bar against the employment of persons who have completed successfully a methadone maintenance program and who otherwise

---

[3] See, *e. g.,* 3 Court of Appeals Joint App. in No. 76-7295, pp. 1106a–1112a.

[4] The Court seems to imply that because the Transit Authority's policy with respect to former methadone users had not been invoked against any of the named plaintiffs, it was improper for the District Court to certify a class of former users who would be affected by the policy. *Ante,* at 572–573, n. 3, 576–577, n. 12. Even if one were to consider it proper for this Court to disregard the District Court's explicit finding that plaintiff Frasier "was rejected because of his *former* methadone use," 399 F. Supp., at 1034 (emphasis supplied), the Court overlooks the further finding:

"[I]t is unquestioned that there are many methadone maintenance patients who successfully withdraw from methadone and stay clear of drug abuse thereafter. Plaintiff Beazer is such a person, having ceased using methadone almost two years ago.

"There is no rational reason for maintaining an absolute bar against the employment of these persons regardless of their individual merits." *Id.,* at 1051.

It is clear that Beazer both was a proper representative of the class of former users and was interested in Transit Authority employment, inasmuch as reinstatement was part of the relief he sought. In light of the Transit Authority's unequivocal policy of not employing persons in Beazer's position, it was unnecessary for him to engage in the futile ritual of reapplying for employment after terminating his methadone use in order to have standing to attack the policy.

are qualified for employment. See *Vance* v. *Bradley, ante,* at 111; *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976); *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 40 (1973). I therefore would affirm the judgment below with respect to the class of persons who are former methadone users.

Mr. Justice Brennan, dissenting.

I would affirm for the reasons stated in Part I of Mr. Justice White's dissenting opinion.

Mr. Justice White, with whom Mr. Justice Marshall joins, dissenting.

Although the Court purports to apply settled principles to unique facts, the result reached does not square with either Title VII or the Equal Protection Clause. Accordingly, but respectfully, I dissent.

I

As an initial matter, the Court is unwise in failing to remand the statutory claims to the Court of Appeals. The District Court decided the Title VII issue only because it provided a basis for allowing attorney's fees. 414 F. Supp. 277, 278 (SDNY 1976). The Court of Appeals did not deal with Title VII, relying instead on the intervening passage of the Civil Rights Attorney's Fees Awards Act of 1976,[1] which authorized the award of fees for success on the equal protection claim today held infirm by the Court. 558 F. 2d 97, 99–100 (CA2 1977). In such circumstances, on finding that we disagree with the judgment of the Court of Appeals as to the constitutional question, we would usually remand the unexplored alternative basis for relief.[2] *E. g., Vermont Yankee*

---

[1] 42 U. S. C. § 1988.

[2] The Court finds it inappropriate to remand because the Title VII question "was fully aired before the District Court, . . . involves the application of settled legal principles to uncontroversial facts, and . . .

*Nuclear Power Corp.* v. *NRDC,* 435 U. S. 519, 549 (1978). And see *Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252, 271 (1977), which involved nearly identical circumstances. That course would obviate the need for us to deal with what the Court considers to be a factual issue or at least would provide assistance in analyzing the issue.

Because the Court has decided the question, however, I must express my reservations about the merits of that decision. In a disparate-impact hiring case such as this, the plaintiff must show that the challenged practice excludes members of a protected group in numbers disproportionate to their incidence in the pool of potential employees.[3] Respondents made out a sufficient, though not strong, prima facie case by proving that about 63% of those using methadone in the New York City area are black or Hispanic and that only about 20% of the relevant population as a whole belongs to one of those groups.[4] I think it fair to conclude, as the District Court must

has been carefully briefed in this Court without any of the parties' even suggesting the possibility of a remand." *Ante,* at 583–584, n. 24. The Court is able to overturn the Title VII judgment below, however, only after reversing some of the District Court's key findings of fact, which the parties strongly contest, on grounds that were not aired at all in the District Court or the Court of Appeals. See n. 4, *infra,* and *infra,* at 600 and n. 6.

[3] See *ante,* at 584; *Dothard* v. *Rawlinson,* 433 U. S. 321, 329 (1977). The failure to hire is not "because of" race, color, religion, sex, or national origin if the adverse relationship of the challenged practice to one of those factors is purely a matter of chance—a statistical coincidence. See *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 430 (1971); Civil Rights Act of 1964, § 703 (a), 42 U. S. C. § 2000e–2 (a). Beyond the statistically significant relationship between race and participation in methadone programs shown by the figures here, respondents introduced direct evidence that the high frequency of minorities among the disqualified group was not just a chance aberration. See nn. 7 and 15, *infra.*

[4] The Court asserts that the proper percentage is 36.3. Respondents relied upon the 1970 census figures for the New York Standard Metropolitan Statistical Area work force: 15.0% black and 5.1% Hispanic. Petitioners accept the 20% figure. Brief for Petitioners 53. And the

have, that blacks and Hispanics suffer three times as much from the operation of the challenged rule excluding methadone users as one would expect from a neutral practice. Thus, excluding those who are or have been in methadone programs "operate[s] to render ineligible a markedly disproportionate number" of blacks and Hispanics. *Griggs* v. *Duke Power Co.,* 401 U. S. 424, 429 (1971).

In response to this, the Court says that the 63% statistic was not limited to those who worked for or sought to work for petitioners and to those who have been successfully maintained on methadone, and that it does not include those in private clinics. *Ante,* at 584–586. I suggest, in the first place, that these attacks on facially valid statistics should have been made in the District Court and the Court of Appeals, see *Dothard* v. *Rawlinson,* 433 U. S. 321, 331 (1977); the first contention was not even made in this Court. It also seems to me that petitioners have little to complain about insofar as the makeup of the applicant pool is concerned since they refused on grounds of irrelevancy to allow discovery of the racial background of the applicants denied employment pursuant to the methadone rule.

In any event, I cannot agree with the Court's assertions that this evidence "reveals little if anything," "tells us nothing," and is "virtually irrelevant." *Ante,* at 585–586.[5] There is not a

District Court apparently did so also. No matter which figure is correct, there is still a disparate impact.

[5] The Court quotes *Teamsters* v. *United States,* 431 U. S. 324, 340 n. 20 (1977), to the effect that " 'evidence showing that the figures for the general population might not accurately reflect the pool of qualified job applicants' undermines the significance of such figures." *Ante,* at 586, n. 29. Petitioners have not put on such "evidence"; we have only the Court's hypotheses, facially unlikely ones at that. Under the Federal Rules of Evidence, to be admissibly relevant, evidence must only tend to establish a material fact. This evidence does that, and by definition unrebutted probative evidence on *the* material fact is sufficient to make out a prima facie case.

shadow of doubt that methadone users do apply for employ-
ment with petitioners, and because 63% of all methadone users
are black or Hispanic, there is every reason to conclude that a
majority of methadone users who apply are also from these
minority groups. Almost 5% of all applicants are rejected due
to the rule, and undoubtedly many black and Hispanic meth-
adone users are among those rejected. Why would propor-
tionally fewer of them than whites secure work with petitioners
absent the challenged practice? The Court gives no reason
whatsoever for rejecting this sensible inference, and where
the inference depends so much on local knowledge, I would
accept the judgment of the District Court rather than purport
to make an independent judgment from the banks of the
Potomac. At the very least, as I have said, I would seek the
views of the Court of Appeals.

The Court complains that even if minority groups make
up 63% of methadone-user applicants this statistic is an
insufficient indicator of the composition of the group found
by the District Court to have been wrongly excluded—that
is, those who have been successfully maintained for a year or
more. I cannot, however, presume with the Court that blacks
or Hispanics will be less likely than whites to succeed on
methadone. I would have thought the presumption, until
rebutted, would be one of an equal chance of success, and
there has been no rebuttal.

Finally, as to the racial composition of the patients at
private clinics, I note first that the District Court found that
"[b]etween 62% and 65% of methadone maintained persons
in New York City are black and Hispanic . . . ." 414 F.
Supp., at 279. The finding was for the total population, not
just for public clinics. Even assuming that the Court wishes
to overturn this finding of fact as clearly erroneous, I see no
support for doing so. The evidence from the Methadone In-
formation Center at Rockefeller University indicated that
61% of all patients in the metropolitan area were black or
Puerto Rican (with 5.85% undefined). This was based on a

1,400-patient sample, which, according to the Center, "was drawn on a random basis and very accurately reflects the *total population* for Metropolitan New York City" (emphasis supplied). There is no reason to believe that this study, which in its reporting of the total number of patients of all races included both public and private clinics, did not include private programs in its racial-composition figures.[6]  And even if everyone in the private clinics were white, a highly unlikely assumption at best,[7] the challenged rule would still automatically exclude a substantially greater number of blacks and Hispanics than would a practice with a racially neutral effect.

With all due respect, I would accept the statistics as making

---

[6] Petitioners suggest that the evidence did not include private clinics since the Center does not receive information from them.  Had this objection been raised in the District Court as it should have been, respondents would have had the opportunity to remove any doubt about whether the evidence included private programs.  Moreover, in support of their suggestion, petitioners rely upon two isolated statements that do not directly discuss the study in question.  Dr. Lukoff testified that the private clinics report to the FDA but not to the "Rockefeller Institute register," and he estimated that there were about *1,500* patients in such unreporting clinics.  Tr. 252 (Jan. 9, 1975) (emphasis supplied). Dr. Dole, a professor at Rockefeller University and senior physician at the University Hospital, testified that "the methadone data center . . . maintains the computerized inventory on *all 40,000* patients in treatment" and that "[a]ll of the known programs report, I presume."  *Id.*, at 114 (Jan. 7, 1975) (emphasis supplied).  He did testify that "[t]he most detailed documentation comes from the major public" programs, which "comprise about 25,000 out of the 40,000" methadone patients. As to the remaining patients, his program still had "simpl[e] registry information . . . ."  *Id.*, at 115–116.  In short, the majority's unsupported effort to undermine the District Court's findings of fact merely establishes the wisdom of either remanding or, on the Court's evident assumption that the Court of Appeals would have affirmed the Title VII judgment, abiding by the "two-court rule."

[7] The evidence before the District Court established that 80% of heroin addicts in the New York City metropolitan area, the source of clients for both public and private methadone clinics, are black or Hispanic.

a prima facie case of disparate impact. Obviously, the case could have been stronger, but this Court is unjustified in displacing the District Court's acceptance of uncontradicted, relevant evidence. Perhaps sensing that, the Court goes on to say that if such a prima facie showing was made it was rebutted by the fact that the rule is "job related."

Petitioners had the burden of showing job relatedness. They did not show that the rule results in a higher quality labor force, that such a labor force is necessary, or that the cost of making individual decisions about those on methadone was prohibitive. Indeed, as shown in the equal protection discussion *infra,* petitioners have not come close to showing that the present rule is "demonstrably a reasonable measure of job performance." *Griggs,* 401 U. S., at 436. No one could reasonably argue that petitioners have made the kind of showing demanded by *Griggs* or *Albemarle Paper Co. v. Moody,* 422 U. S. 405 (1975). By petitioners' own stipulation, see n. 14, *infra,* this employment barrier was adopted "without meaningful study of [its] relationship to job-performance ability." *Griggs, supra,* at 431. As we stated in *Washington v. Davis,* 426 U. S. 229, 247 (1976), Title VII "involves a more probing judicial review of, and less deference to, the seemingly reasonable acts of administrators and executives than is appropriate under the Constitution . . . ." Therefore, unlike the majority, *ante,* at 587 n. 31, I think it insufficient that the rule as a whole has some relationship to employment so long as a readily identifiable and severable part of it does not.

## II

I also disagree with the Court's disposition of the equal protection claim in light of the facts established below. The District Court found that the evidence conclusively established that petitioners exclude from employment all persons who are successfully on methadone maintenance—that is, those who after one year are "free of the use of heroin, other illicit

drugs, and problem drinking," 399 F. Supp. 1032, 1047 (SDNY 1975)—and those who have graduated from methadone programs and remain drug free for less than five years; [8] that past

[8] Because the rule is unwritten in relevant part, there is confusion about its scope. The Court asserts that it does not exclude those who formerly used methadone, and that the District Court "did not settle the question of what policy TA enforces in this respect . . . ." *Ante,* at 572 n. 3. In fact, however, petitioners openly admit that they automatically exclude former methadone users unless they "have been completely drug free and have had a stable history for at least five years." Brief for Petitioners 5. And I quote the District Court's actual finding which in context is unlike that described by the majority:

"It is clear that a relatively recent methadone user would be subject to the blanket exclusionary policy. However, the TA has indicated that there might be some flexibility with respect to a person who had once used methadone, but had been free of such use for a period of five years or more." 399 F. Supp., at 1036.

The Court finds no "concrete dispute between adverse litigants" over the former-users policy because no former user is entitled to relief under the District Court's injunction. *Ante,* at 573 n. 3. But respondent Frasier is a former user, see *ante,* at 576–577, n. 12, and the District Court expressly granted him relief, including backpay from the time he was rejected as a recent former methadone user. App. to Pet. for Cert. 77a–78a. The Court says the District Court erred in finding as facts that Frasier was using no narcotics in April 1973 and that petitioners refused to hire him solely because of his prior, apparently successful methadone treatment. As I read the facts as recited by the Court, the District Court was clearly correct, but in any event petitioners have not preserved this argument in the Court of Appeals or here. See Defendants' Proposed Findings of Fact 6–7 (filed Oct. 18, 1974) (Frasier "purportedly" graduated successfully from the methadone program on March 19, 1973, and, though otherwise eligible, was rejected due to "his drug history" on April 2, 1973). See also *ante,* at 596 n. 4 (POWELL, J., dissenting in relevant part).

The Court apparently reads the District Court's injunction as protecting only those persons who had been in methadone programs for a year or longer before they were cured. It is incredible that the District Court would have punished those persons able to triumph over heroin addiction in less than a year. And the context of the District Court's order, combined with the grant of relief to respondent Frasier, makes it clear that the court intended to protect, and had good reason to do so, *all* former

or present successful methadone maintenance is not a meaningful predictor of poor performance or conduct in most job categories; that petitioners could use their normal employee-screening mechanisms to separate the successfully maintained users from the unsuccessful; and that petitioners do exactly that for other groups that common sense indicates might also be suspect employees.[9] Petitioners did not challenge these factual conclusions in the Court of Appeals, but that court nonetheless reviewed the evidence and found that it overwhelmingly supported the District Court's findings. 558 F. 2d, at 99. It bears repeating, then, that both the District Court and the Court of Appeals found that those who have been maintained on methadone for at least a year and who are free from the use of illicit drugs and alcohol can easily be identified through normal personnel procedures and, for a great many jobs, are as employable as and present no more risk than applicants from the general population.

Though petitioners' argument here is primarily an attack upon the factfinding below, the Court does not directly accept that thesis. Instead, it concludes that the District Court and the Court of Appeals both misapplied the Equal Protection

methadone users as well as those current users who have been successfully maintained for more than a year.

[9] Respondents presented numerous top experts in this field and large employers experienced with former heroin users treated with methadone. Both sides rested after six days of trial, but the District Court demanded nine more days of further factual development, and an 8-hour inspection of petitioners' facilities, because it did not believe that the evidence could be so one-sidedly in respondents' favor. The court correctly realized its responsibility in a public-law case of this type to demand the whole story before making a constitutional ruling. See Chayes, The Role of the Judge in Public Law Litigation, 89 Harv. L. Rev. 1281 (1976). The District Court called six witnesses of its own, and it chose them primarily because they had written articles on methadone maintenance that petitioners asserted had shown the unreliability of that method of dealing with heroin addiction. It also correctly expressed its refusal to base its judgment on shifting medical opinions.

Clause. On the facts as found, however, one can reach the Court's result only if that Clause imposes no real constraint at all in this situation.

The question before us is the rationality of placing successfully maintained or recently cured persons in the same category as those just attempting to escape heroin addiction or who have failed to escape it, rather than in with the general population.[10] The asserted justification for the challenged classification is the objective of a capable and reliable work force, and thus the characteristic in question is employability. "Employability," in this regard, does not mean that any particular applicant, much less every member of a given group of applicants, will turn out to be a model worker. Nor does it mean that no such applicant will ever become or be discovered to be a malingerer, thief, alcoholic, or even heroin addict. All employers take such risks. Employability, as the District Court used it in reference to successfully maintained methadone users, means only that the employer is no more likely to find a member of that group to be an unsatisfactory employee than he would an employee chosen from the general population.

Petitioners had every opportunity, but presented nothing to negative the employability of successfully maintained methadone users as distinguished from those who were unsuccessful. Instead, petitioners, like the Court, dwell on the methadone failures—those who quit the programs or who remain but turn to illicit drug use. The Court, for instance, makes much of the drug use of many of those in methadone programs, including those who have been in such programs for more than one year. *Ante,* at 576, and n. 10. But this has little force

---

[10] The rule's treatment of those who succeed is at issue here, since the District Court effectively amended the complaint to allege discrimination against that subgroup, see Fed. Rule Civ. Proc. 15 (b), and implicitly found no constitutional violation with respect to others burdened by the practice.

since those persons are not "successful," can be and have been identified as such, see *ante,* at 574–575,[11] and, despite the Court's efforts to put them there, see *ante,* at 590 n. 33, are not within the protection of the District Court's injunction. That 20% to 30% are unsuccessful after one year in a methadone program tells us nothing about the employability of the successful group, and it is the latter category of applicants that the District Court and the Court of Appeals held to be unconstitutionally burdened by the blanket rule disqualifying them from employment.

The District Court and the Court of Appeals were therefore fully justified in finding that petitioners could not reasonably have concluded that the protected group is less employable than the general population and that excluding it "has no rational relation to the demands of the jobs to be performed."[12] 399 F. Supp., at 1057. In fact, the Court assumes that petitioners' policy is unnecessarily broad in excluding the successfully maintained and the recently cured, *ante,* at 592, and that a member of that group can be selected with adequate precision. *Ante,* at 574–575. Despite this, the validity of the exclusion is upheld on the rational basis of the uninvolved portion of the rule, that is, that the rule excludes many who are less employable. But petitioners must justify the distinction between groups, not just the policy to which they have attached the classification. The purpose of the rule as a whole is

---

[11] The evidence indicates that poor risks will shake out of a methadone maintenance program within six months. 399 F. Supp., at 1048–1049. It is a measure of the District Court's caution that it set a 1-year standard.

[12] A major sponsor of the recent amendments to the Rehabilitation Act, see *ante,* at 580–581, and n. 16, described the congressional determination behind them as being that a public employer "cannot assume that a history of alcoholism or drug addiction, including a past addiction currently treated by methadone maintenance, poses sufficient danger in and of itself to justify exclusion [from employment]. Such an assumption would have no basis in fact . . . ." 124 Cong. Rec. 37510 (1978) (Sen. Williams).

relevant only if the classification within the rule serves the purpose, but the majority's assumption admits that is not so.

Justification of the blanket exclusion is not furthered by the statement that "any special rule short of total exclusion . . . is likely to be less precise" than the current rule. *Ante,* at 590. If the rule were narrowed as the District Court ordered, it would operate more precisely in at least one respect, for many employable persons would no longer be excluded. Nor does the current rule provide a "bright line," for there is nothing magic about the point five years after treatment has ended. There is a risk of "regression" among those who have never used methadone, and the Court cannot overcome the District Court's finding that a readily ascertainable point exists at which the risk has so decreased that the maintained or recently cured person is generally as employable as anyone else.[13]

Of course, the District Court's order permitting total exclusion of all methadone users maintained for less than one year, whether successfully or not, would still exclude some employables and would to this extent be overinclusive. "Overinclusiveness" as to the primary objective of employability is accepted for less successful methadone users because it fulfills a secondary purpose and thus is not "overinclusive" at all. See *Vance* v. *Bradley, ante,* at 109. Although many of those who have not been successfully maintained for a year are employable, as a class they, unlike the protected group, are not as employable as the general population. Thus, even assuming the bad risks could be identified, serving the end of employability would require unusual efforts to determine those more likely to revert. But that legitimate

---

[13] Though a person free of illicit drug use for one year might subsequently revert, those who have graduated from methadone programs might do so also, and the Court apparently believes that the employment exclusion could not constitutionally be extended to them. See *ante,* at 572–573, n. 3, and 591–592, n. 37. See also *ante,* at 596–597 (POWELL, J., dissenting in relevant part).

secondary goal is not fulfilled by excluding the protected class: The District Court found that the fact of successful participation for one year could be discovered through petitioners' normal screening process without additional effort and, I repeat, that those who meet that criterion are no more likely than the average applicant to turn out to be poor employees.[14]  Ac-

---

[14] Since the District Court found as a fact that the bad risks could be culled from this group through the normal processing of employment applications, the only possible justification for this rule is that it eliminates applications in which petitioners would invest some time and effort before finding the person unemployable. The problem, however, is that not everyone in the general population is employable. Thus, if vacancies are to be filled, individualized hiring decisions must be made in any event.

The fact of methadone use must be determined somehow, so all applications must at least be read, and petitioners require all applicants under 35, and many existing employees, to submit to urinalysis. Reading the applications may disclose not only the fact of methadone use but also whether the person has certain educational or other qualifications and whether he or she has had a stable employment experience or any recent job-related difficulties.

The Court says that petitioners would be burdened by having to verify that a methadone applicant was successful in his program. But the program itself verifies that fact, and the District Court found that all petitioners would have to do is get in touch with the program, and that "this is essentially no different from obtaining relevant references for other types of applicants." 399 F. Supp., at 1050 n. 3. A number of expert witnesses testified that the methadone clinics have far more information about their patients than personnel officers could ordinarily hope to acquire. The Court fears that some of the programs might not be reliable, but the District Court found that most are and ruled that petitioners do not have to hire any applicant "where there is reason to doubt the reliability of" the information furnished by the applicant's clinic. *Id.,* at 1058; accord, *id.,* at 1050 n. 3. Consequently, I see no error at all, much less clear error, in the District Court's finding of fact that petitioners "can perform this screening for methadone maintenance patients in basically the same way as in the case of other prospective employees." *Id.,* at 1048; accord, *id.,* at 1037 and 1050 n. 3.

As to supervision of those who are hired, the fact that they present no greater risk than any other employee eliminates the need for *any* special supervision, except perhaps a notation on their personnel files that they

cordingly, the rule's classification of successfully maintained persons as dispositively different from the general population is left without any justification and, with its irrationality and invidiousness thus uncovered, must fall before the Equal Protection Clause.[15]

need not be assigned to safety-sensitive positions. The District Court found as a fact that petitioners' methods of monitoring all their employees "can be used for persons on methadone maintenance just as they are used for other persons . . . ." *Id.*, at 1037.

[15] I have difficulty also with the Court's easy conclusion that the challenged rule was "[q]uite plainly" not motivated "by any special animus against a specific group of persons." *Ante*, at 593 n. 40. Heroin addiction is a special problem of the poor, and the addict population is composed largely of racial minorities that the Court has previously recognized as politically powerless and historical subjects of majoritarian neglect. Persons on methadone maintenance have few interests in common with members of the majority, and thus are unlikely to have their interests protected, or even considered, in governmental decisionmaking. Indeed, petitioners stipulated that "[o]ne of the reasons for the . . . drug policy is the fact that [petitioners] fee[l] an adverse public reaction would result if it were generally known that [petitioners] employed persons with a prior history of drug abuse, including persons participating in methadone maintenance programs." App. 83A. It is hard for me to reconcile that stipulation of animus against former addicts with our past holdings that "a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528, 534 (1973). On the other hand, the afflictions to which petitioners are more sympathetic, such as alcoholism and mental illness, are shared by both white and black, rich and poor.

Some weight should also be given to the history of the rule. See *Arlington Heights* v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 267–268 (1977). Petitioners admit that it was not the result of a reasoned policy decision and stipulated that they had never studied the ability of those on methadone maintenance to perform petitioners' jobs. Petitioners are not directly accountable to the public, are not the type of official body that normally makes legislative judgments of fact such as those relied upon by the majority today, and are by nature more concerned with business efficiency than with other public policies for which they have no direct responsibility. Cf. *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 103, (1976). But see *ante*, at 592. Both the State and City of New York, which do

610

Finally, even were the District Court wrong, and even were successfully maintained persons marginally less employable than the average applicant,[16] the blanket exclusion of only these people, when but a few are actually unemployable and when many other groups have varying numbers of unemployable members, is arbitrary and unconstitutional. Many per-

exhibit those democratic characteristics, hire persons in methadone programs for similar jobs.

These factors together strongly point to a conclusion of invidious discrimination. The Court, however, refuses to view this rule as one "circumscrib[ing]" a class of persons characterized by some unpopular trait or affiliation," *ante,* at 593, because it is admittedly justified as applied to many current and former heroin addicts. Because the challenged classification unfairly burdens only a portion of all heroin addicts, the Court reasons that it cannot possibly have been spurred by animus by the "ruling majority." All that shows, however, is that the characteristic in question is a legitimate basis of distinction in some circumstances; heroin addiction is a serious affliction that will often affect employability. But sometimes antipathy extends beyond the facts that may have given rise to it, and when that happens the "stereotyped reaction may have no rational relationship— other than pure prejudicial discrimination—to the stated purpose for which the classification is being made." *Mathews* v. *Lucas,* 427 U. S. 495, 520–521 (1976) (STEVENS, J., dissenting; footnote omitted). That is the case here.

[16] The District Court found that the only common physical effects of methadone maintenance are increases in sweating, insomnia, and constipation, and a decrease in sex drive. 399 F. Supp., at 1044–1045. Those disabilities are unfortunate but are hardly related to inability to be a subway janitor. This Court hints that the employability of even those successfully being maintained on methadone might be reduced by their obligation to appear at their clinics three times a week. *Ante,* at 588–589, n. 32. But all employees have outside obligations, and petitioners have neither argued nor proved that this particular duty would interfere with work.

The District Court did find that a possible but rare effect of methadone is minor impairment of abilities "required for the performance of potentially hazardous tasks, such as driving a car or operating machinery," 399 F. Supp., at 1045, and the court exempted from the relief ordered such positions as subway motorman, which require "unique sensitivity." *Id.,* at 1052. But this does not make rational the blanket exclusion from all jobs, regardless of the qualifications required.

sons now suffer from or may again suffer from some handicap related to employability.[17] But petitioners have singled out respondents—unlike ex-offenders, former alcoholics and mental patients, diabetics, epileptics, and those currently using tranquilizers, for example—for sacrifice to this at best ethereal and likely nonexistent risk of increased unemployability. Such an arbitrary assignment of burdens among classes that are similarly situated with respect to the proffered objectives is the type of invidious choice forbidden by the Equal Protection Clause.[18]

---

[17] The District Court found, and petitioners have not challenged, that current problem drinkers present more of an employment risk than do respondents. Petitioners do not automatically discharge employees who are found to have a drinking problem. *Id.*, at 1058.

[18] The Court argues that "the fact that [petitioners have] the resources to expend on one class of problem employees does not by itself establish a constitutional duty on [their] part to come up with resources to spend on all classes of problem employees." *Ante*, at 591–592, n. 37. If respondents were demanding to have the benefit of a rehabilitation program extended to them, petitioners could perhaps argue for freedom to deal with only one problem at a time due to limited resources. See *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 489 (1955). In that situation, the lack of resources, or the desire to experiment in a limited field, might be a legitimate objective explaining the classification. But respondents are not asking for special, beneficial treatment; they are asking why they should be absolutely excluded from the opportunity to compete for petitioners' jobs.