598 F.Supp. 159 (1984)
Larry ELLISON, Individually and on behalf of all others similarly situated, Preston Jordon, Bobby Bobo, Malinda J. Simmons, Plaintiffs,
v.
BEST FOODS, A DIVISION OF C.P.C. INTERNATIONAL, INC., Mary L. Day, Intervenor (8-30-82), Issac Lunnie (Plaintiff in Intervention), Jean Walker (Plaintiff in Intervention (11-1-83)), Defendants.
No. LR-C-81-15.
United States District Court, E.D. Arkansas, W.D.
November 14, 1984.
*160 Morris W. Thompson, Little Rock, Ark., for plaintiffs.
Frederick S. Ursery, Friday, Eldridge & Clark, Little Rock, Ark., for defendant.

MEMORANDUM AND ORDER
EISELE, Chief Judge.

Introduction
This is an employment discrimination case involving seven former employees of defendant Best Foods, Incorporated. The complaint in this action was originally filed as a class action. Initially there was only one plaintiffMr. Larry Ellisonbut in 1981, the Court permitted the addition of three other plaintiffs. Since that time three more former employees were allowed to intervene in the suit. On August 30, 1982, the Court denied the plaintiffs' motion for class certification.
All plaintiffs bring claims under 42 U.S.C. § 1981 and all except one plaintiff sue under Title VII as well. In essence, the plaintiffs allege two theories: (1) that the defendant's method of operating its plant had a disparate impact on blacks and, (2) that specific decisions rendered with respect to the individual plaintiffs evidence disparate treatment. As to the disparate treatment claims, all of the plaintiffs argue that their terminations or denials of promotions were based improperly on racial considerations. In their disparate impact claims, six of the plaintiffs contend that the nature of the system of management and organization of the firmthe "self-regulated work force system"has a disparate impact on blacks. According to the plaintiffs, black employees advance less rapidly, are disciplined more often, and are discharged at a greater rate, than their white counterparts.
The trial of this action was held over seven days in April and June of this year. At the conclusion of the trial, the plaintiffs requested leave to brief the issues before the Court rendered its decision. Although the Court granted the request and allowed both parties to file post-trial briefs, only the defendant actually submitted same.
The Court has now considered the testimony at trial, the arguments of counsel *161 and the various briefs that were submitted pre and post trial. For the reasons stated below, it concludes that the plaintiffs failed to sustain their burden of proving that they were the victims of racial discrimination under either the disparate impact or the disparate treatment theories. As a consequence, all claims must be dismissed.
Before discussing the individual cases, the Court will briefly discuss the applicable law. As noted above, claims are asserted under Title VII and 42 U.S.C. § 1981. The applicable provision in Title VII42 U.S.C. § 2000e-2 provides:
(a) It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.
Section 1981 provides:
Equal rights under the law
All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Disparate Treatment
To establish liability for disparate treatment under either statute, the plaintiffs must prove they have been the victim of intentional racial discrimination.
The Supreme Court in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), discussed the order and allocation of the burdens of proof in Title VII disparate treatment cases:
In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), we set forth the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." Id. 411 U.S. at 802, 93 S.Ct. at 1824. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Id. 411 U.S. at 804, 93 S.Ct. at 1825.
The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.
450 U.S. at 252-53, 101 S.Ct. at 1093 (footnote omitted). These same principles regarding the order and allocation of the burdens of proof also apply to actions based on section 1981. See Walker v. International Business Machines, 698 F.2d 959, 961 (8th Cir.1983).

Prima Facie Case
To make out a prima facie case of discriminatory discharge, each plaintiff had to show that
(1) he was a member of a protected class,
(2) he was capable of performing the job, and
(3) he was discharged from the job.
Johnson v. Bunny Bread Co., 646 F.2d 1250, 1253 (8th Cir.1981) (citing Osborne v. Cleland, 620 F.2d 195, 198 (8th Cir.1980)[1]
*162 To make out a prima facie case of failure to promote, plaintiffs had to show:
(1) they belong to a protected class;
(2) they applied for a job for which they were qualified;
(3) despite their qualifications, they were rejected; and
(4) thereafter, the position remained open and the employer continued to seek applicants with qualifications similar to those of the plaintiffs.
Moore v. Bank of Dardanelle, 732 F.2d 162 (8th Cir., 1984) (citing Hawkins v. Anheuser-Busch, Inc., 697 F.2d 810, 812 (8th Cir.1983)). As noted in Bank of Dardanelle, a plaintiff may fail to show he is qualified for a position even if he has the same qualifications as did a predecessor in that position if defendant upgraded the qualifications in an effort to improve its business. The court's language in Bank of Dardanelle is instructive:
It is clear that appellants failed to make out a prima facie case since they were not qualified to perform the same duties for which Armstrong was hired. Armstrong had two college degrees in business and banking and was a lawyer with significant prior banking experience. In contrast, appellants had only completed one year of college and had been previously employed at the Bank performing primarily clerical duties. It is true that appellants need not prove their relative qualifications to meet their prima facie burden. See Hawkins, 697 F.2d at 812-14. At this stage, the focus must be on the job skills actually demanded by the job and not merely on the qualifications an employee might happen to possess. See id. But the position for which Armstrong was hired demanded and utilized both his previous banking experience and education and also his legal background. The Bank had not had in-house legal counsel for some time and Armstrong spent over one-half of his time in a legal capacity revising loan documents. Furthermore, he answered legal questions of the Board of Directors on a daily basis. Appellants obviously could not perform these tasks. Although prior presidents and vice presidents of the Bank did not have law degrees, we agree with the district court that the Bank was not required to ignore Armstrong's education. The district court noted that by having previous presidents with no particular formal expertise in banking, the Bank had a "mediocre" operation. The Bank hoped to change this situation by hiring a more qualified individual instead of merely promoting from among the Bank's current employees someone less qualified. Indeed, it appears the strategy worked, since after hiring Armstrong, the Bank's profits quadrupled. We therefore uphold the district court's finding that appellants failed to submit a prima facie case of sex discrimination. (footnotes omitted)
Bank of Dardanelle, slip op. at 3-4.
When the plaintiffs made out prima facie cases as required, the burden of production was then shifted to the defendant to articulate a legitimate, non-discriminatory reason for terminating the plaintiffs. The court finds that the defendant has met this burden in each of the seven cases.
Therefore, each plaintiff had to carry the ultimate burden of proving that he or she was the victim of intentional discrimination. This can be done by "directly persuading the court that a discriminatory reason more likely motivated the employer or ... by showing that the employer's proffered explanation is unworthy of credence. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).
The plaintiffs also alleged discrimination in terms, conditions and privileges of employment. The Eighth Circuit has recently stressed that:
A working environment dominated by racial hostility ahd harassment constitutes *163 a violation of Title VII regardless of any other tangible job detriment to minority employees. An employer violates Title VII simply by creating or condoning an environment at the work place which significantly and adversely affects the psychological well-being of an employee because of his or her race. * * *
More than a few isolated incidents of harassment must have occurred to establish a violation of Title VII. * * * Whether the degree of harassment is sufficiently severe and persistent to trigger Title VII sanctions is to be determined from a totality of the circumstances.
Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir.1984).
One of the allegations in this case is that the work atmosphere was pervasively polluted by racial slurs and racial jokes. Obviously, such a situation should not be forced upon minority employees. But the Court believes that the mere existence of some sporadic or isolated racial slurs does not necessarily establish a Title VII violation. Of course, if there is a "steady barrage of opprobrious racial comment" then a Title VII violation may arise. See Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir.1981), Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir.1981). Where the evidence does not show that the use of racial slurs is anything more than sporadic, particularly where management personnel are not directly involved in making or witnessing them, then that evidence, standing alone, will not "trigger" Title VII sanctions. See Bunny Bread, 646 F.2d at 1257. In the end, as noted in Gilbert, the totality of the circumstances must be assessed in determining whether to impose sanctions pursuant to Title VII.

Disparate Impact
The nature of the proof in a disparate impact case varies from that in a disparate treatment case. As observed by the Eighth Circuit in Kirby v. Colony Furniture Co., Inc., 613 F.2d 696, 703-04 (8th Cir.1980),
[P]roof of discriminatory intent is not required under a disparate impact theory. In such a case the Title VII claim is that a facially neutral employment practice actually falls more harshly on one racial group, thus having a disparate impact on that group .... As set out by the Court in Griggs v. Duke Power Co., supra [401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158], to establish a prima facie case on a disparate impact claim, a plaintiff need not show that the employer had a discriminatory intent but need only demonstrate that a particular practice in actuality "operates to exclude Negroes." Once the plaintiff has established the disparate impact of the practice, the burden shifts to the employer to show that the practice has a "manifest relationship to the employment in question." The "touchstone is business necessity" and the practice "must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." Furnco Construction Co. v. Waters, supra, 438 U.S. [567] at 583, 98 S.Ct. [2943] at 2952-53 [57 L.Ed.2d 957] (Marshall, J., dissenting) (citations omitted); see e.g., United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308 (8th Cir.1972) (en banc), cert. denied, 409 U.S. 1107, 93 S.Ct. 900, 34 L.Ed. 687 (1973). If the employer then meets the burden of proving that its challenged employment practice is justified by business necessity, the plaintiff may then show that other employment practices, which lack a similarly discriminatory effect, would satisfy "the employer's legitimate interest in `efficient and trustworthy workmanship.'" Albemarle Paper Co. v. Moody, supra, 422 U.S. at [405] 425, 95 S.Ct. [2362] at 2375 [45 L.Ed.2d 280], citing McDonnell Douglas Corp. v. Green, supra, 411 U.S. [792] at 802, 93 S.Ct. 1817 [36 L.Ed.2d 668]; cf. Dothard v. Rawlinson, 433 U.S. 321, 329, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (sex discrimination).
[12] Thus, an employment practice which has a disparate impact upon a group protected under Title VII is invalid unless the employer can prove the challenged *164 practice is justified by business necessity. In other words, under a disparate impact theory, a prima facie showing shifts the burden of producing evidence to the employer. The burden of proof is upon the employer to establish business necessity. (footnotes omitted)
Colony Furniture expressed some indecision as to the nature of the burden placed on the defendant once the plaintiff has made out its prima facie case. See 613 F.2d at 703 n. 5 ("The exact nature of this burden of proof is unclear."). The Eleventh Circuit has indicated that the employer bears the burden of persuasion, not merely the burden of production:
[8, 9] A plaintiff may also bring a Title VII action under the disparate impact theory. Disparate impact is used to attack employment practices that are facially neutral yet fall more harshly on a protected class of employees. The employer's intent is not at issue. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). A prima facie case is established by identification of a neutral employment practice coupled with proof of its discriminatory impact. Johnson v. Uncle Ben's Inc., 657 F.2d 750, 753 (5th Cir.1981), cert. denied, 459 U.S. 967, 103 S.Ct. 293, 74 L.Ed.2d 277 (1982). Disparate impact may be established by statistical evidence. New York City Transit Authority v. Beazer, 440 U.S. 568, 584, 99 S.Ct. 1355, 1365, 59 L.Ed.2d 587 (1979). Once plaintiff establishes a prima facie case the burden of persuasion shifts to the employer. Johnson, 657 F.2d at 752-53. The employer must then prove either that the practice is related to job performance, Dothard v. Rawlinson, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), or that plaintiff's statistical proof is unacceptable. EEOC v. Datapoint Corp., 570 F.2d 1264, 1269-70 (5th Cir.1978).
Eastland v. Tennessee Valley Authority, 704 F.2d 613, 619 (11th Cir.1983).

The Self-Regulated Work Force System.
All except one of the plaintiffs bring a disparate impact claim in addition to their disparate treatment claims. In essence, the plaintiffs allege that the defendant's system of management and organization the "self-regulated work force system" has a disparate impact on blacks. According to the plaintiffs, the defendant's Little Rock plant is "modeled on the sociotechnical systems theory of Tavistock Institute of Human Relation, London, England." Plaintiffs assert that "one of the attributes of this design is the organization of workers into responsible autonomous or semi-autonomous subgroups. The groupings of workers are related in terms of task requirements and task interdependence leading to development of mutually supportive roles." As plaintiffs state, the employee teams are empowered through democratic processes to make certain decisions regarding employee discipline, work scheduling and assignment, training, etc.
The gravamen of plaintiff's argument is that the self-regulated work force system adversely impacts on blacks because, despite the fact that blacks comprised approximately 30 percent of the overall work force and were included on each team, blacks allegedly fared less well under the system than did their white counterparts, particularly in the area of terminations.
In explaining the nature of the defendant's management system, the plaintiffs relied principally on the testimony of Mr. Don Morrison, former plant manager of the Little Rock plant, and Dr. Chris Spatz, an associate professor at Hendrix College, who presented certain statistical evidence. It was Mr. Morrison who provided substantial testimony regarding the theory behind the self-regulated work force.
It should be noted that Mr. Morrison was part of the consulting team that designed the management system with the help of Dr. Lou Davis of U.C.L.A. As noted above, Mr. Morrison became the Little Rock plant's second plant manager and in the five years he served in this capacity, he had a significant role in the implementation of the program.
*165 Mr. Morrison explained that the program was designed to allow employees to have more input in some areas of management than that occurring in traditional American management systems. The designers of the system were striving to blend a technical system with a social system to develop a "team concept." To accomplish this, the designers first identified the equipment and the areas in which it was to be located, then identified the applicable tasks and the number of personnel necessary to run each piece of equipment. Since the designers wanted members of each team to have similar working conditions, they broke down the organization into functionally-related groups. Six teams were then created for the Little Rock plant: Administration, Management, Roasting and Sorting ("R & S"), Processing and Packaging ("P & P"), Shipping and Receiving, and Preparation and Repair.
As noted previously, the management scheme was devised so that many employer rules would be actually developed by the employees, or perhaps more appropriately, by the teams. Certain basic rules were set by the company management, such as the production schedules, vacation policies, and holiday schedules. Nevertheless, the teams were given significant responsibility in formulating "norms"i.e., certain performance or practice standards that the employees were expected to adhere to. The overriding theory was that if employees help to establish the norms, they will adhere to them. According to Mr. Morrison, there was no pre-established procedure for setting norms. Some norms were established in response to unforeseen problems. In some situations teams sought the help of management in devising appropriate norms. Plaintiffs offered Plaintiffs' exhibit 209, "Code of Conduct", as one example of the norms.
Mr. Morrison explained various other features of this management system. He noted, for example, that each team had several "coordinator" rolespositions held by employees who performed duties that in a "traditional" system would be carried out by management personnel. For instance, coordinators would do scheduling and implement training programs. Teams would also have a "counselor," whose job it was to meet with workers whose behavior was deemed dysfunctional to the social and work system. Mr. Morrison stated that there was frequent "informal counseling" by which any one employee might attempt to help a co-worker. He stated that except for the norm on absenteeism there is no set number of times an employee can violate a norm before "official" counseling commences.
The basic system of "behavior review" is set forth in the plant's written policies. See Plf's exh. 175. Mr. Morrison described the various steps in the counseling/disciplinary system. Many "infractions" of norms were dealt with by the teams in the first instance. A team may vote to counsel a team member for violation of a norm, or alternatively it may vote to "contract" that team memberi.e., require that employee to agree in writing to mend his or her ways. Morrison noted that an employee could be terminated if he fails to live up to his contract, but he also pointed out that normally an employee who has been contracted would not be terminated without a prior finding that he is not fulfilling the contract.
Disciplinary authority is also exercised by the Plant Membership Review Board, comprised of one employee representative from each team together with one representative of management. This board conducts fact-finding investigations and then makes recommendations to the plant manager whether to retain or discharge an employee. Mr. Morrison stressed that the Board could only "recommend"the final decision rests with the plant manager. Mr. Morrison noted also that disciplinary decisions normally were initially considered by the teams, and then only later considered by the Plant Review Board. For certain "serious" infractions, however, the Board would exercise automatic immediate review, regardless of whether there had been a prior recommendation to terminate or discipline by the relevant team. This immediate *166 review alternative was specifically provided for under the plant's written policy. See Plf's exh. 175. Mr. Morrison cited "stealing" as an example of conduct that would merit immediate review by the Plant Review Board. Indeed, P & P team meeting minutes dated January 17, 1980, state that "Anyone caught stealing, permanent or temporary, will be fired." See Plf's exh. 318. As Morrison explained, if an employee has violated a very important norm, thus meriting direct review by the Plant Review Board, the team can make a recommendation to the Review Board, but this recommendation may have little impact on the Board's or the manager's decision.
Mr. Morrison also discussed two additional facets of the management system in place at the Little Rock plant. First, he noted that each team normally holds a team meeting at least once each week on company time to discuss all aspects of the team's operation. Frequently, discussions about the need for employee "counseling" would arise during these meetings. Second, Morrison described the subgroups within each team known as "clusters." Within each team there are several distinct functions. Members of each team are encouraged to become proficient in the functions of each cluster within the team. Each time an employee is "certified" as proficient in a new cluster, he or she receives an increase in pay. As Morrison pointed out, it is the "training coordinator's responsibility to see that each employee has an opportunity to receive the training necessary for him to become certified in the various clusters." He noted, however, that sometimes training in a new cluster might be delayed because of an absence of personnel within a cluster or because of the absence of a "floater" (substitute worker) within the existing group. Moreover, he noted that when an employee is "contracted" due to some disciplinary problem, his or her ability to train in a new cluster is temporarily suspended.

Subjectivity in Decision-Making
The plaintiffs sought to make much out of the fact that some of the decision-making in these cases was tainted by subjective factors, rather than purely objective factors. As discussed elsewhere in this opinion, the plaintiffs' allegations of pervading subjectivity in all decision-making was simply without a factual basis in the evidence. This is not to say that subjective views did not come into play in certain situations.
The Court believes that several comments are in order. First, the Court recognizes that the pervasive use of subjective standards can create a greater potential for racially discriminatory decision-making. As other courts have noted, use of subjective factors in evaluating employees for promotion or for discipline may be probative of intentional racial discrimination because such evaluation processes may mask actual racial bias. See Harris v. Ford Motor Co., 651 F.2d 609 (8th Cir. 1981); Satz v. ITT Financial Corp., 619 F.2d 738, 746 (8th Cir.1980). Yet the mere existence of subjective factors in employment decision-making does not necessarily require an inference that racial discrimination has occurred. The use of subjective factors per se is not an evil that is sought to be eliminated by way of Title VII and related legislation. See Anderson v. City of Bessemer City, 717 F.2d 149, 155 (4th Cir.1983); rather it is the use of racial factors in the employment decision-making context that is sought to be eliminated. Sometimes the two coincide: an employer may invoke loose or highly-discretionary policies in order to cloak its true reason for taking an adverse actionracial bias. Obviously, such situations are intolerable and, accordingly, the courts have wisely and properly realized that management systems characterized by subjectively-based decision-making are suspect. Thus, when a court encounters such a system it must be on alert and must subject the decision-making process to close scrutiny. Page v. Bolger, 645 F.2d 227, 230 (4th Cir.1981) (en banc).
However, courts must recognize that there are limitations on the ability of management to foretell and address with objective standards all potential problems that *167 might arise in the workplace. In part, managers exist not only to apply the objective standards, but also to "fill in the gaps" when such objective standards are lacking. And whereas a well-established organization might be expected to fashion more objective rules, a new and emerging organization might be expected to have to resort to on-the-spot, case-by-case rule fashioning until precedents are established from which policy can be more confidently established. Furthermore, if "democracy" is to be introduced into the workplace, management must give up some of its old prerogatives and invest a limited amount of discretion in the employee teams.
Applying the preceding observations to the case at bar, it is noteworthy that the Best Foods plant first opened in 1977. Thus, at the time most of these problems and incidents arose, the plant had not been in full operation for a very long period of time. It is also relevant that, as discussed above, the Best Foods plant was clearly experimenting with a new and rather innovative form of workplace management. As might be expected, the company experienced some "growing pains" at least in the early going. Perhaps the greatest source of trouble was the periodic problem of management uncertainty. From time to time a problem would arise that had not been foreseen by the designers of the self-regulated workforce system. The teams would be involved in resolving an issue for which they knew of no precedent. See Plf's exh. 266 (Social System Task Force Meeting Minutes of 5-28-80) (Statement of Allen Thomas). Apparently none of the employees had ever worked under this type of system and consequently they felt compelled to draw upon and seek out the knowledge and abilities of management personnel in order to deal with such unforeseen problems.
Thus, some of the decision-making appeared to have certain subjective aspects. While the teams were supposed in theory to make most disciplinary decisions, at least in the first instance, they would sometimes seek assistance from management primarily Mr. Hirchak. The plaintiffs focused upon these instances as evincing some form of mistreatment of blacks. Yet it is clear to the Court that in the early stages of development of the self-regulated workforce system, the parties were simply uncertain how to proceed. The fact remains that at the time most of the problems resulting in this lawsuit arosefrom 1977 to 1980there simply was a dearth of standard operating procedures. In short, at the times critical to this lawsuit, the procedures were not fully regularized. Obviously, such a condition will not immunize the defendant from actions that stemmed from discriminatory conduct. Yet, it is more difficult to draw an inference of discrimination from ad hoc responses to new problems when policies are in an evolutionary stage.
The dangers posed by the alleged subjectivity in discipline were also muted by certain built-in safeguards intended to prevent discrimination. It is clear that the teams were not given full power to decide the fate of their members. It is true that most significant disciplinary actions, such as termination, could be initiated by the team. But it is also true that there was a clear review process: most such "significant" actions would be subject to review by the Plant Review Board and then by the plant manager. This procedure provides a vehicle to expose discrimination if it is present and to insulate employees from bias. Cf. EEOC v. E.I. DuPont de Nemours & Co., 445 F.Supp. 223, 249 (D.Del.1978) (automatic review procedure and existence of written evaluation criteria insulate employees from bias).
As noted previously, there were certain allegations that the defendant had discriminated generally in terms and conditions of employment and that whites were treated more favorably than blacks. As to the general claim that whites were treated more favorably, the Court finds that the plaintiffs simply have not met their burden of proof in this regard. Although they presented some evidence to support such claims, this was successfully refuted both directly and indirectly by the evidence *168 presented by the defendant. For example, several black employees testified that they did not feel blacks were, or are, treated less favorably than whites under this system. In fact many of the black witnesses including some plaintiffs praised the system in terms of its general operation. And the statistical evidence, discussed below, does not support such general allegations.
The plaintiff also claimed that a racist atmosphere prevailed at the plant and that this was due to the acts of the defendant. Several of the plaintiffs testified that they were subjected to racial epithets, and Mr. George McCarty, a white person, stated that he was offended by racist jokes that circulated in the plant.[2] The critical fact is that there was little evidence that management was directly involved in any of this or that it in any way condoned or tolerated such behavior. It is true that Mr. McCarty stated that Mr. Lopez, the supervisor of maintenance was apparently privy to some racist remarks. Moreover, Mr. Jordan said that he was subject to a racial insult by the security guard when he and the guard had a confrontation. Finally, Ms. Walker stated Mr. Hirchak once called her a "nigger bitch." As to this latter statement, the Court simply does not believe Ms. Walker. She never mentioned the statement previously, in her EEOC charge, in her complaint, or in her deposition. Furthermore, she never complained about it to Mr. Morrison or others. Having observed Mr. Hirchak and Ms. Walker at the time the alleged statement was cited at trial, the Court must conclude that the alleged racial remark by Mr. Hirchak never occurred. See discussion of Ms. Walker's claim below.
The Court must also conclude that under the totality of the circumstances, the defendant did not create or condone a racist atmosphere. Nor did such an atmosphere exist. Like many business organizations, the defendant's plant was apparently not free from some race problems, but they were sporadic and apparently confined to a relatively few black and white employees. There is nothing in the evidence that would trigger liability under Title VII or section 1981.

Statistics
The core evidence supporting the plaintiffs' disparate impact claim was presented through the testimony of their statistics expert Dr. Chris Spatz, Jr. Dr. Spatz has served as Associate Professor at Hendrix College since 1973 and has authored several books, including a textbook on statistics. It was the Court's general impression that, as the case went on, he became more of an advocate and less of an objective expert. Yet he was clearly well-motivated and has appropriate credentials. So it is important to deal with this study and his professional opinions.
Dr. Spatz employed, inter alia, the Chi Square Analysis to determine whether the discharge rate and advancement rates of employees at the plant were related to their race. As he explained, the chi square value would disclose the probability that the relationships seen might arise by chance alone. Dr. Spatz's conclusions were summarized in a four-page table, Plf's exh. 33. He stated that from his analysis he did not draw any conclusions regarding the type of management system used as opposed to any other standard management technique. He did conclude, however, that comparing whites to blacks, the differences in advancement and education were not statistically significant but that the difference in the discharge rates was significant.
Dr. Spatz stated that he did not compile his own data base. Instead, that base was furnished to him by the plaintiffs' lawyer. The data base was comprised of 183 long-term employees at the plant between 1977 and January 13, 1981. He explained that he chose January 13, 1981, because that was the date the lawsuit was filed.[3] Excluded from the group were employees who *169 "did not fit into the time frame we were considering" as well as employees of Asian race.[4]
It is proper to note at this point that the selection of January 13, 1981, had a very strong effect on the outcome of Dr. Spatz's figures. The evidence revealed that on January 29, 1981, three whites were discharged from the plant for the same type of infraction that served as the basis for discharge for one of the plaintiffs. Since these three white persons were terminated, no other employee, black or white, has been discharged or fired from the plant. Thus, were the three whites included in Dr. Spatz's computations his list would have included every single dischargee over the plant's entire history. Dr. Spatz admitted that inclusion of the three would change the chi square value to the point that the difference in discharge rates between blacks and whites would no longer be statistically significant. As noted elsewhere in this opinion, there is nothing in the evidence to support the suggestion that the three whites were fired by the defendant in order to make the figures not statistically significant. The Court credits the defendant's evidence that the three were discharged for the reasons stated.
It also appears that the plaintiffs included Mr. James Gatewood, a black employee, in the list of those discharged. The plaintiffs' inclusion of Mr. Gatewood is understandable since the defendant supplied his name in a list of discharged personnel. See Plf's exh. 552. At trial, however, it developed that Mr. Gatewood resigned and was not discharged. At first, Dr. Spatz said he did not know whether exclusion of Mr. Gatewood would change the degree of significance. Later, however, he admitted that the exclusion of Mr. Gatewood would reduce the statistical significance.
The defendant rebutted the plaintiffs' statistical evidence through the testimony of Dr. Kent Galchus, Associate Professor of Economics at University of Arkansas at Little Rock since 1976. Dr. Galchus has impressive credentials. He has a Ph.D. degree and a J.D. degree and has authored numerous books and articles. Dr. Galchus refuted Dr. Spatz's testimony on nearly every critical point. Most notably, the two differed over the applicability of the "Yates Correction for Continuity," which is designed primarily for use with relatively small samples to increase the accuracy of the probability statement. See Barnes, Statistics As Proof: Fundamentals of Quantitative Evidence, 180-81 (1983), Plf's exh. 556.
Dr. Spatz asserted that the Yates Correction tends to "overcorrect" and he cited one study in support of his position. See Plf's exh. 556. It appears that it is generally acknowledged in the statistics filed that the Yates Correction does have certain limits. Dr. Spatz explained that the key to implementing the Yates Corporation does have certain limits. Dr. Spatz explained that the key to implementing the Yates Correction factor turned on whether there is a discrete versus a continuous distribution. Dr. Galchus stated that the Yates Correction factor was applicable because there was a discrete distributioni.e., it is not possible to have 1½ blacks v. 2½ whites, etc. Dr. Galchus acknowledged that the Yates Correction factor was not recommended where the sample is random, but it is acceptable where, as in this case, the sample is fixed. Dr. Spatz attempted to argue at one point that the Yates Correction was still applicable in this case because the figures he used were random. It appears that he based this conclusion on the fact that the three whites discharged in January of 1981 were not included in his sample. Dr. Spatz later agreed that the addition of the three would provide the entire population of those discharged and thus, a fixed number with which to work. In this situation, it seems clear that the use of the Yates Correction factor would be appropriate.
*170 The Court deemed much of the controversy over applicability of the Yates Correction factor to be somewhat superfluous. There were, of course, numerous questionable aspects to the method by which the plaintiffs' sample was defined and selected. And as noted above, even Dr. Spatz was forced to admit that the inclusion of the three whites who were discharged in January of 1981, as well as the deletion of Mr. Gatewood, would have rendered the result statistically insignificant. Thus, even if the Yates factor were ignored, the fact remains that the plaintiffs' statistics simply did not reach the necessary level to be deemed statistically significant. The Court concludes that in this case the use of the Yates factor was appropriate. Application of this factor further reduced the significance of the plaintiffs' statistics.
More importantly, the Court credits the testimony of Dr. Galchus. It concludes that the true statistics simply fail to reach the necessary degree of significance to support the claim that blacks were being discharged at a disproportionate rate. Furthermore, as the plaintiffs' own analysis demonstrated, the statistics do not support the plaintiffs' claim with respect to promotions and advancement. See Plf's exh. 33, p. 3. Furthermore the plaintiffs have failed to establish the necessary causative nexus between the self-regulated work force system and the discharges at the defendant's plant.
From the evidence, the Court finds and concludes that the plaintiffs have failed to make out a prima facie case that the system of management employed by the defendant has a disparate impact on blacks. Each plaintiff must therefore establish his or her disparate treatment claim in order to prevail.
Before taking up the individual disparate treatment claims, the Court observes that even if this management system were shown to have had a disparate impact on black employees, it would not follow that the system should therefore be automatically stricken down. Democracy in the workplace is a concept favored by many, both in labor and in management. The democratic process always contains some potential of penalizing minority groups whether such groups be racial, religious, economic or political. This is true not only when such a process is employed in the workplace but also in the larger political life of citizens in all democratic nations. That possibility, or even actuality, should not be sufficient, without more, to condemn the whole process. And even though other systems might meet the employer's strictly business objectives, the wider social objectives of such employee-democracy systems should not be sacrificed solely because of the availability of such traditional alternate management systems. Rather, the emphasis should be placed on devising safeguards of minority rights in the manner that the U.S. Constitution protects certain rights of minorities while still permitting majority rule in most areas.
And there is a more fundamental question: Should such management systems be treated under the disparate impact analysis at all? Or stated otherwise, can the company by choosing such a management system be thereby said to have adopted a "policy" or "practice" which, upon later analysis, may be said to have a disparate impact? The policy of democracy in the workplace, it can be argued, is not what might cause some later identified disparate impact. Rather it can only be the perversion of, or the improper use of, such a system that would have such a result. Therefore, it can be argued, it would follow that one must pursue a disparate treatment approach by establishing in the particular case that discriminatory racial motives were injected into the democratic process. This analysis reveals the causation problem. Democracy in the workplace can simply not be equated to such policies as requiring janitors to have high school diplomas. However, it is not necessary to deal with this issue further because, even if the disparate impact analysis is appropriate in such cases generally, the evidence does not disclose such an impact here.
*171 Editor's Note: at the suggestion of the court, the remainder of the opinion, dealing with individual claims, has been omitted from publication.
NOTES
[1] Osborne cited a fourth factor to be shown that the Eighth Circuit in Bunny Bread failed to mention: that the defendant sought persons with the plaintiff's qualifications to fill his former job after the plaintiff's discharge. See 620 F.2d at 198.
[2] Mr. McCarty stated also that from time to time he also told racial jokes.
[3] It should be noted, however, that another race discrimination case had been filed by black employees against the company in 1978. See Deloney v. Best Foods, No. LR-C-87-248.
[4] Apparently at least two employees, Ms. Ella Berry and Mr. Koy Nakanshi were excluded because they were considered to be Asian.