**David GARZA, Jr., Plaintiff,**

v.

**CITY OF INGLEWOOD,**
**Defendant (Two Cases).**

**Nos. CV 87–7251(AAH),**
**CV 89–5582(AAH).**

United States District Court,
C.D. California.

April 12, 1991.

Laurence B. Labovitz, Los Angeles, Cal., for plaintiff.

Thomas F. Overlander, Overlander, Aherne & Lewis, Glendale, Cal., for defendant.

FINDINGS OF FACT AND CONCLU-
SIONS OF LAW AND ORDER FOR
JUDGMENT IN FAVOR OF DEFEN-
DANT CITY OF INGLEWOOD

HAUK, District Judge.

Plaintiff David Garza, Jr., (Garza) in consolidated actions sues his employer the City of Inglewood. Count I alleges discrimina-

tory failure to promote under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000e by reason of his failure to be appointed Acting Captain in June of 1987 and his failure to be promoted to the rank of Captain as a result of a promotional examination which he participated in in March of 1989. Count II alleges that the failure to promote resulted in a deprivation of property without due process of law in violation of the Fourteenth Amendment actionable under 42 U.S.C. Section 1983. Garza has abandoned all previous claims that he was deprived of equal protection under the law in violation of 42 U.S.C. Section 1981.

In Count I Garza claims that the City of Inglewood has a practice and policy of discrimination against Hispanics on account of their national origin which deliberately limits promotional opportunities within the police department as evidenced by various statistics and subjective procedures for making "acting appointments to fill temporary vacancies." Garza claims that the appointment of a Lieutenant Les Friesen to the position of Acting Captain in June of 1987 was discriminatory.

The plaintiff also claims that on May 30, 1989, he participated in the promotional examination to select a candidate to fill a vacant Captain's position. He claims that the examination process was unreasonably subjective and "rigged" in order to insure that he would be ranked last of all the candidates and not promoted.

In Count II the plaintiff claims that his failure to be promoted to the position of Captain constitutes a deprivation of property without due process of law in violation of the Fourteenth Amendment. He alleges that this deprivation was caused by an official custom or policy of the City of Inglewood to discriminate against Hispanics because of their national origin in promotional opportunities at the Captain's level.

## FINDINGS OF FACT

A non-jury trial was held by the court, April 8–12, 1991. Based on the final pretrial order, which is incorporated by reference, and the testimony before the court, the court finds the following facts, as of the relevant times, many of which are adopted from the parties' statement of uncontested facts in the pre-trial order:

1. Garza was born June 24, 1936 in Los Angeles, California. His father was born in the United States in the State of New Mexico and is of Mexican descent. His mother was born in Mexico and is of mixed French/Mexican descent.

2. Garza was employed by the City of Inglewood on October 16, 1960 as a Patrol Officer with the Inglewood Police Department. In 1969 he was promoted to Lieutenant, a rank he now holds.

3. Garza knows of no instance when the City has discriminated against any Hispanic because of his national origin with respect to employment or promotion at the level of Sergeant and Lieutenant.

4. There is no written or unwritten policy or practice of the City of Inglewood to discriminate against Hispanics with respect to employment with the Inglewood Police Department. On the contrary the city has an official policy of affirmative action to actively seek out and recruit minority members for the police department. Garza himself has been called upon and has personally participated in these recruiting efforts.

5. On July 23, 1987 Garza filed a complaint with the EEOC alleging that in June, 1987 two Police Lieutenants were placed as "acting captains" although he was next on the promotion list.

6. In June, 1989 the plaintiff filed a second complaint with the EEOC alleging that he had been discriminated against because of his national origin by reason of the fact that he was placed fifth on the eligible list after the promotional examination due to the fact that none of the interviewers/raters were Hispanic/Mexican-American.

7. On August 11, 1986, due to retirement, a Captain's position became vacant in the Inglewood Police Department. The City issued an announcement seeking applicants for a promotional examination to be conducted on September 15, 1986.

8. The plaintiff participated in the promotional process which consisted of an Assessment Center and was ranked No. 2

amongst the list of candidates. The No. 1 ranked candidate, James Butts, an African–American, was appointed to the vacant position.

9. On September 24, 1986 an eligibility list was created by the Department ranking the candidates in accordance with the numerical score they obtained in the examination process. The eligible list, which is valid for one year, expired on September 24, 1987.

10. Under the Civil Service Rules and Regulations of the City of Inglewood, if a position is vacated during the time an eligibility list is in effect the position is filled by a candidate on the list rather than repeating the competitive examination process.

11. The process for promoting Police Lieutenants to the rank of Captain when a vacancy is created within the Inglewood Police Department is a competitive examination procedure which all persons having two years experience as a Police Lieutenant within the Department are eligible to participate in. After the examination process is completed, each candidate's results are numerically scored and a list is created, from which the three persons ranked highest are certified by the City's personnel manager in what is traditionally called the "rule of three." From the list of three candidates, the Chief of Police as the Department head and appointing authority, selects the lieutenant who will be promoted. The general practice within the Department has been to promote the person ranked No. 1 on the list of three with only one known exception.

12. During the calendar year 1987 the Inglewood Police Department had three captains, each in charge of a separate division. Those three captains were under the direct supervision of the Deputy Chief of Police, who was concurrently in charge of the Office of Administrative Services. The Deputy Chief reported directly to the Chief of Police.

13. The three divisions within the Department were: the Office of Special Enforcement, the Office of Criminal Investigations, and the Office of Operations.

14. The Inglewood Civil Service Rules and Regulations which were adopted by the Inglewood City Counsel on March 30, 1971 were in effect at all relevant times herein.

15. The Civil Service Rules state the official policy of the City with respect to personnel management principles, employment, promotions, employee relations, and the like. They expressly prohibit discrimination against any employee because of race, sex, color, creed or national origin. They require that all promotions and employment appointments be in accordance with merit and fitness alone.

16. The Civil Service Rules and Regulations (CSRR) contain specific procedures and policies relating to "acting appointments" to fill City positions that are temporarily vacated. Acting appointees are temporarily assigned to perform the duties of the position vacated. An acting appointment is not a promotion. The appointee receives no change in rank by reason of the appointment.

17. While working in an acting capacity which lasts more than one pay period, an acting appointee is entitled to a five percent increase in his salary until the incumbent has returned to duty.

18. The need for acting appointments arises under many circumstances, the duration of which may or may not be known in advance. Vacations, illness, business travel, or retirement are among some of the causes of temporary vacancies.

19. As department head, the Chief of Police or his designee is authorized to make acting appointments under the Civil Service Rules and Regulations. In no case may the acting appointment be extended for more than a period of 90 days without special approval of the City Manager.

20. In June of 1987 Garza was Lieutenant in the Criminal Investigations Division of Inglewood Police Department.

21. In June 1987 Captain Alex Augusta was in charge of the Office of Special Enforcement. Lieutenant Les Friesen was directly under the supervision of Captain Augusta working in the Office of Special Enforcement.

22. On Saturday, June 13, 1987, Chief Johnson learned that Captain Augusta had

been admitted to Cedars–Sinai Hospital. On Monday, June 15, 1987, Chief Johnson directed Lieutenant Les Friesen to take over Captain Augusta's duties until further notice. Since acting appointments are temporary assignments and are not promotions they are always filled by selecting the next person in line within that division. There has been no recorded instance of any person being transferred from another division. Such a procedure only makes good sense from a management perspective and avoids disruption in the running and operation of the police department.

23. Garza cannot state a prima facie case of discrimination by reason of not being appointed Acting Captain to replace Captain Augusta during his illness. Applications for the position were not being sought nor did Garza at any time apply for the position, merely mentioning to a Deputy Chief that he was interested. Likewise, Garza was not qualified for the position due to the fact that he was not working within the Office of Special Enforcement.

24. Garza was not deprived of an acting appointment because of his national origin. During the calendar year 1987 Garza, who was assigned to the Office of Criminal Investigations was made Acting Captain on three separate occasions when his Division Head Captain James Seymour was absent. Specifically, Garza was Acting Captain of the Office of Criminal Investigations on January 27, 28, 29 and 30, 1987; November 1, 2, 3, 4, 5 and 6, 1987 and November 17, 18 and 19, 1987.

25. While Garza was appointed Acting Captain three times during the year of 1987 the only other Lieutenant in the Office of Criminal Investigations Lieutenant George Joseph was appointed Acting Captain on two occasions.

26. With respect to the filling of acting appointments during the year of 1987 Garza was not treated differently than any other employee in the Inglewood Police Department nor was he discriminated against because of his national origin. The decision to appoint Lieutenant Les Friesen as Acting Captain was for legitimate, non-discriminatory reasons, fully justified under the circumstances. Acting appointments are not coveted positions within the Inglewood Police Department and are not given great weight to the individual seeking a promotional opportunity within the department. Acting appointments are not made on vague or subjective criteria. The criteria for acting appointments is well-defined in practice, providing that the person next in line in that division and currently working in the job and who knows what work is going on be selected for the temporary assignment.

27. On March 17, 1988 by reason of a vacancy created by the announced retirement of Deputy Chief Robert Gavney, the City of Inglewood announced a promotional opportunity for appointment to fill the vacancy. It was decided to eliminate the position of Deputy Chief of Police and replace it with a Captain's position.

28. The City utilized a two-step promotional process for this Captain's position, consisting of an independent Assessment Center and an internal Departmental Evaluation, each worth 50% of the total score for each candidate.

29. Garza participated in the competitive selection process along with four other Lieutenants. The Departmental Evaluation process had been utilized by the Police Department in promotional evaluations since 1987. The two raters who were assigned to conduct the Departmental Evaluation (which included one minority member) were the two remaining Captains in the Inglewood Police Department, James Butts and James Seymour. Each was given previously compiled records of each applicant consisting of their annual departmental evaluations for the three preceding calendar years 1985–1986; 1986–1987 and 1987–1988 along with their resume. Each rater was given instructions to rate each applicant's demonstrated potential to fill the requirements of the sought after position in five areas; leadership, judgment, cooperation, communication and initiative. The raters were required to provide a written explanation justifying the grade given to each candidate. The initial scores assigned to each applicant were derived by each rater without consultation with the others.

30. Although the raters were permitted to add their specific, first-hand observations about candidate's work style and managerial ability, those observations were pertinent to the skills required for the Captain's position. While most of this material relied upon by the raters was subjectively derived, it was required to be evaluated and reviewed first by the Deputy Chief of Police Robert Gavney and then separately by the Chief of Police Raymond Johnson, a minority member.

31. There is no evidence that James Seymour or James Butts were biased, prejudiced or in any way discriminated against Garza because of his national origin.

32. Garza was given a numerical score of 85% on the departmental appraisal. Any score over 70% was considered passing. The rating that was given to Garza is supported by the evidence and testimony to have been fair and non-discriminatory.

33. The second part of the promotional examination consisted of an Assessment Center which was conducted by a professional outside testing service, TLT & Associates. The Assessment Center is a situationally based performance evaluation, custom designed to determine an applicant's ability to carry out the duties of a Captain with the Inglewood Police Department. In order to preserve objectivity the assessors who are selected to conduct the evaluation are from outside the department. They are chosen based upon their availability, experience, knowledge and impartiality, and include Hispanics–Latinos and other minorities when and if available.

34. The Assessment Center attempts to measure a candidate's present skills, technical knowledge, interpersonal skills, communication skills, analytical ability, versatility, leadership, planning, organization, implementation of skills, aptitude, decision-making abilities, motivation and potential success in the position.

35. The measurement tools used in the Assessment Center consisted of an in-basket exercise, writing assignment, leaderless discussion group, graphic presentation and stress test.

36. In the leaderless discussion group, the candidate is evaluated on his skills to promote a point of view and to support the group's discussion without dominating the process. Articulation, logic and understanding group dynamics are measured in this test.

37. The in-basket exercise measures the candidate's ability to separate essential from non-essential issues and to process an assortment of problems in a timely manner. The candidate is evaluated on his ability to delegate those problems and act on items best handled at a lower level. It measures his own response to specific day-to-day problems that confront a Captain within specific time constraints.

38. In the writing assignment the candidate is asked to describe strategies he would use in dealing with personnel employee relations problem.

39. In the graphic presentation an employee is given an opportunity to demonstrate his ability to think and plan strategically and put forth his ideas on how the department will meet the needs of the community by discussing things that are working well as well as those that need improvement.

40. In the stress test the candidate is required to give narrative answers to verbal questions relating to their ability, experience and what actions they would take as to resolve specific departmental problems.

41. The examination process followed by the City of Inglewood has a combination of objective and subjective elements.

42. The position of Police Captain involves highly sophisticated administrative and technical work in supervising, planning, developing and coordinating law enforcement activities. It requires a thorough familiarity with modern police techniques, methods and practices as well as leadership qualities, judgment, initiative, the ability to motivate and instill confidence and supervise subordinates. Many other qualities required of a Captain cannot be measured accurately through standardized testing techniques. Subjective testing techniques are unavoidably necessary to successfully measure and determine a candidate's qualities which are crucial to fulfilling the duties of the position sought.

43. Garza received a numerical score of 82.73 from the Assessment Center.

44. There is no evidence that the testing process was "rigged" or otherwise designed in advance to assure that Garza obtained a low score.

45. There is no evidence that Garza was discriminated against or treated differently than other candidates because of his national origin by any of the raters or assessors.

46. Garza's combined numerical score from the Assessment Center and departmental evaluation was 83.87%.

47. On May 31, 1989, an eligible list was prepared ranking the candidates in their numerical order. Garza placed No. 5 on the list.

48. Under the "Rule of Three" the eligible employees in order of their score were Lieutenants Jon Oliver, Bernard Held, and Larry Carter. After interviewing the top three candidates Chief Raymond L. Johnson appointed Jon Oliver who ranked No. 1 to the vacant Captain's position.

49. In March of 1990 another vacant Captain's position arose by reason of the promotion of Captain James Butts, a minority, to the position of Deputy Chief of Police. Since the eligible list was still in effect, not due to expire until May 30, 1990, the Chief was required to select a candidate to fill the vacancy from the existing list.

50. After interviewing the next top three candidates Chief Johnson appointed Lieutenant Larry Carter to the vacant position.

51. At no time between May 31, 1989 and May 30, 1990 was Garza qualified to be appointed to either of the vacant Captain's positions since he was never ranked within the top three eligible candidates.

52. Garza has failed to establish a prima facie case of discrimination by showing that any similarly situated employee of a different national origin was treated differently than him. He offers only his conclusionary statement concerning a "general attitude" of bias and prejudice which in itself is insufficient to raise an inference of discrimination.

53. The plaintiff has also shown no direct evidence of bias by any Inglewood City employee whose decision affected him in employment. On the contrary, upon close and persistent questioning by the Court, he conceded that he had no reason to believe that the appointing authority and the department head, Chief Raymond L. Johnson, or anybody in the Department or the City discriminated against him or any other employee because of their national origin.

54. Of the other three involved employees, Deputy Chief Robert Gavney, Captain James Butts and Captain James Seymour, Garza has produced no evidence that they were biased or discriminated against him or any other Hispanic in the Department because of their national origin.

55. Garza has produced no evidence that his national origin was taken into consideration or played any role at all in any decision affecting him.

56. The statistical evidence offered by the plaintiff shows that in 1989 at the time of the Captain's examination there were 11 Lieutenants in the Police Department. Garza and Lieutenant Susan Cox, a female, were the only minorities in that group. Above the Lieutenant level there were 3 Captain's positions and the Chief of Police. The Chief of Police and Captain James Butts are both African–Americans. Captain James Seymour is a non-minority. After the appointment of Jon Oliver to the vacancy 50% of the people in the supervisory ranks above Lieutenant were minority members, the Chief and one captain.

57. In March of 1990 after the promotion of James Butts to Deputy Chief and the appointment of Larry Carter as Captain, two of the five, to wit, 40% of the supervisory ranks above Lieutenant were filled by minorities.

58. The statistical proof presented by the plaintiff fails to show any disparity between minorities and non-minorities in the supervisory positions above Lieutenant.

59. The statistical evidence is unpersuasive insofar as the relevant database is too small to permit any meaningful conclusions that the tests in question select applicants

for promotion in a pattern significantly different from the pool of applicants.

60. Garza is the only Hispanic Lieutenant and represents only 8% of the qualified pool of candidates. The three available Captain's positions do not statistically allow for an 8% representation for any group or sub-group, protected or non-protected, from the available pool of candidates.

61. The plaintiff has failed to identify any specific or particular subjective testing practice that has created a disparate impact other than to claim that the testing procedure itself is subjective and inherently discriminatory. This is not sufficient insofar as he must identify each specific practice and show that each challenged practice has a significantly disparate impact on minorities.

62. Even assuming, arguendo, that the plaintiff has presented such a prima facie case of discrimination, the defendant has effectively rebutted this prima facie case with explicit, legitimate reasons for the decision to select persons within a particular division to fill temporary vacancies by acting appointments and to select the testing process which was followed in the 1989 Captain's exam.

63. Garza's job performance was not entirely satisfactory for the years 1985 through 1988 upon which the Departmental Evaluation was based. In 1985 Garza was specifically advised that he lacked self-motivation and frequently could not be located because he had left the building or his job without telling anybody where he was. Garza's supervisor met with him frequently to help him to improve his work and recommended that he become more active and enthusiastic in his work or continue on the road of mediocrity. Garza's comments to his evaluation were invited but he made none.

64. In 1987 Garza was again criticized on areas that for the most part were identical to the problems noted in his previous performance evaluation. He was noted to lack self-motivation, initiative in his work and frequently absent from the station without notifying anyone where he was. Again Garza was invited to comment on his evaluation but declined to say anything.

65. Garza's 1988 evaluation report pointed out the same deficiencies which for the most part appeared in the two prior years; that he needed to demonstrate more initiative in his work and would have to take a more hands-on approach in supervising subordinates. On this occasion Garza did add comments to the report indicating merely that he did not agree with much of the evaluation pointing out a successful homicide investigation he conducted.

66. Each of Garza's supervisors met with him on numerous occasions to discuss ways to improve his performance. Plans were taken to develop specific goals and deadlines. Garza either failed to attempt to meet these goals or his attempt was unsuccessful.

67. The defendant has amply demonstrated that it had legitimate non-discriminatory reasons for its scoring of the plaintiff on the internal Departmental Evaluation, which overwhelmingly rebuts any inference of statistical discriminatory impact, usually referred to as disparate impact.

68. The policy maker for the City of Inglewood with respect to employment, promotional practices and procedures is the Inglewood City Council.

69. The express official policy of the City of Inglewood prohibits discrimination of any kind because of a person's race, sex, color, creed, national origin, religious or political affiliation, or a lack thereof and requires that all promotions be made solely on the basis of merit and fitness.

70. The City of Inglewood Civil Service Rules and Regulations contain comprehensive procedures for the resolution of employee grievances. These grievance procedures set forth in Rule VII, Section 3 permit an employee to pursue the grievance procedures for a wide variety of matters included improper application of rules, regulations and procedures; unfair treatment; promotion procedures implemented unfairly; non-selection for training opportunities; discrimination because of race, religion, color, creed or national origin; and any matter personally affecting an employee's working schedule, or performance rating.

71. An employee pursuing the grievance procedure may have the assistance of another person of his own choosing in preparing and presenting his grievance. The procedure provides for an initial informal discussion with the employee's immediate supervisor. If the employee does not believe that the problem has been satisfactorily resolved he has the right and obligation to discuss it with his supervisor's immediate supervisor and the department head.

72. If the grievance is not resolved through the informal process the employee has the right to file a written grievance and present it through channels to his immediate management supervisor who is required to discuss the grievance with the employee and render a written decision returning it to the employee within 7 days. An employee who is not satisfied with the decision may appeal first to the department head, second to the Personnel Director and third to the City Manager. The decision of the City Manager is appealable and subject to review.

73. The plaintiff alleges that the City has an unconstitutional policy of discriminating against Hispanics because of their national origin. The official policy prohibits such discrimination.

74. Garza did not make use of the grievance procedure to challenge any acts of his supervisors.

75. There is no evidence of any persistent, widespread practice of city officials or employees to discriminate against Hispanics because of their national origin which is so common and well-settled as to constitute a custom or practice that fairly represents municipal policy.

76. Garza's claim that the City does not allow Hispanics to be promoted to high level positions is untrue. The City of Inglewood's Superintendent of Building and Safety is Jose Alvarez, Battalion Chief Julian Ysais of the Inglewood Fire Department and the Superintendent of Property and Zoning, Darlene Baca, are all of Hispanic origin.

## CONCLUSIONS OF LAW

■ 1. The plaintiff makes a prima facie case of discriminatory impact merely by showing that the employer's facially neutral criteria for hiring or promotion have an adverse impact on a protected class to which he or she belongs. *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ 2. Prima facie adverse impact is demonstrated by various statistical means, depending upon the nature of the challenged practice regardless of the method chosen, the plaintiff must present supporting statistical data with some degree of precision. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). In a promotion case such as this, statistics must be based on an applicant pool containing the individuals with minimal qualifications for the job. *Hazelwood School Dist. v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768 (1977).

■ 3. A plaintiff seeking to establish a prima facie case of disparate impact with statistical evidence may do so by first isolating and identifying the specific employment practices that are allegedly responsible for any statistical disparities. The statistics which are offered must show that the employer's specific employment practice has a disparate or adverse impact on the protected group. If the adverse impact is established the employer must show business justification for its use of the selection criteria. Having done so, the plaintiff must then prove that the challenged practice fails in a significant way to serve the employer's legitimate goals. *Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 108 S.Ct. 2777, 2788–90, 101 L.Ed.2d 827 (1988).

4. Statistical evidence derived from an extremely small universe such as that offered in this case, has little predictive value and must be disregarded by the Court. *Morita v. So. Cal. Permanente Medical Group,* 541 F.2d 217, 220 (9th Circuit 1976). Even if the Court were to accept the statistics proffered by the plaintiff, there would be no disparity in the ratio between minority and non-minority employees. While minorities constitute 18.1% of the qualified labor pool of Lieutenants, at all times rele-

vant herein, minority representation at the supervisory levels have exceeded that percentage.

5. Garza's own statistics concerning the qualified labor pool at issue here indicate that approximately 40% of the supervisory personnel above Lieutenant are minorities, although only 18% of the qualified applicants for these jobs were minorities. Since minorities make up a higher percentage than the relevant qualified labor pool Garza, without more, cannot make out a prima facie case of disparate impact. *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 2122, 104 L.Ed.2d 733 (1989). When the percentage of selected applicants who are minorities is not significantly less than the percentage of qualified applicants who are minorities, an employer selection mechanism probably does not operate with a disparate impact. *Id.* 109 S.Ct. at 2123.

6. Since the statistical disparity relied on by Garza does not suffice to make out a prima facie case, any inquiry into whether the specific challenged employment practices of the defendant in using subjective criteria in its promotional examination is pretermitted. However, assuming arguendo that a prima facie case has been stated, the use of subjective as well as objective testing methods by the City of Inglewood to select Captains is not unlawful. The defendant has shown adequate justification for the use of the testing procedure.

7. The plaintiff has not established a prima facie case of discrimination by reason of his failure to be appointed Acting Captain in 1987. The plaintiff must prove (1) that he belongs to a protected class, (2) he applied and was qualified for a job for which the employer was seeking applicants, (3) that despite being qualified the plaintiff was rejected, and (4) that after the plaintiff's rejection the position remained open and other applicants were sought. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Yee v. Depart. of Environ. Serv., Multnomah County*, 826 F.2d 877, 880–881 (9th Circuit 1987).

8. The evidence fails to satisfy the second, third, and fourth requirements. The City did not seek applications for the acting position in question, nor did the plaintiff apply for the position before the appointment was made. Nor was the plaintiff qualified for the assignment, since he was not working within the division where the vacancy occurred or otherwise familiar with the then existing job responsibilities and duties.

9. The plaintiff has also failed to establish a prima facie case of discrimination by showing that other, similarly situated employees of a different national origin were treated differently from him. During 1987, Garza's assignment to the Division of Criminal Investigations qualified him to be appointed Acting Captain to the position of his immediate supervisor, Captain James Seymour, if his position became vacated. Garza was not denied an opportunity to become Acting Captain and, in fact, was appointed Acting Captain on three separate occasions during 1987.

10. Even assuming, arguendo, that Garza has presented such a prima facie case of discrimination, the defendant has effectively rebutted this prima facie case with explicit, legitimate reasons for making acting appointments only from within the division where the vacancy occurs.

11. Plaintiff has also failed to state a prima facie case of disparate treatment with respect to the 1989 promotional examination. The offense alleged in a disparate treatment claim focuses exclusively on the intent of the employer. *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977). In a disparate treatment claim proof of discriminatory motive is critical. Unless it is proved that an employer intended to disfavor the plaintiff because of his membership in a protected class, a disparate-treatment claim is not proven. *Id.* at 336, 97 S.Ct. at 1855.

12. Garza also fails to make out a prima facie case of disparate impact or treatment by reason of his failure to be promoted to Captain in 1989. By reason of

the fact that he did not place within the top three, he was not qualified for promotion.

13. The validity of subjective testing devices increases in direct proportion to the level of employment sought. The qualities and qualifications of candidates to successfully carry out the duties and responsibilities which a position of Captain require cannot be accurately assessed by objective testing alone. The Court finds that the testing procedure consisting of the Departmental Evaluation and Assessment Center, which was used to select candidates for the Captain's position in 1989, was reasonably related to determine a candidate's potential success at filling the sought after position and utilized plainly relevant criteria. *Watson v. Fort Worth Bank*, 487 U.S. 977, 108 S.Ct. 2777, 2791, 101 L.Ed.2d 827 (1988).

14. In a disparate treatment case, the burden of persuasion always stays with the plaintiff. An individual suffers disparate treatment when he is singled out and treated less favorably than others similarly situated on account of any impermissible criterion. The plaintiff can establish a prima facie case of disparate treatment through direct proof of intentional discrimination or by offering evidence adequate to create an inference that an employment decision was based on discriminatory criterion. *Jauregui v. Glendale*, 852 F.2d 1128, 1134 (9th Circuit 1988). Garza has failed to prove directly or circumstantially by a preponderance of the evidence that any employment decision or practice was based on unlawful criterion.

15. Plaintiff alleges that he was deprived of a property right (promotion) without due process of law in violation of the Fourteenth Amendment and seeks redress under 42 U.S.C. Section 1983. A negligent or intentional deprivation of property is not actionable if a meaningful post-deprivation remedy for the loss is available under state law. *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1983). The City of Inglewood's civil service rules and regulations' grievance procedure and California state law satisfy due process requirements.

16. The Court finds that the City of Inglewood City Council is the policymaker with respect to employment and employee classification, compensation, recruitment, promotions, testing, discipline, employee grievances and appeals. The official policy of the Inglewood City Council is set forth in its Civil Service Rules and Regulations and prohibits discrimination in any kind against any employee because of national origin, and requires that all promotions be made solely on merit and fitness. There is no evidence of any widespread custom or practice of City employees to discriminate against Hispanics because of their national origin in any respect so as to establish a customary practice sufficient to impose liability on the defendant. *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

LET JUDGMENT BE ENTERED ACCORDINGLY, AGAINST PLAINTIFF AND IN FAVOR OF DEFENDANT.